# F I L E D

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

MAY 0 5 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| United States of America ex rel. | ) | |
| | ) | |
| **PAUL N. EICHWEDEL, Reg. No. B–02148** | ) | |
| (Full name and prison number) | ) | 08 C 5 0 0 7 7 |
| (Include name under which convicted) | ) | |
| | ) | |
| PETITIONER | ) | CASE NO: _____ |
| | ) | (Supplied by Clerk of this Court) |
| vs. | ) | |
| | ) | *Reinhard* |
| **NEDRA CHANDLER, Warden, Dixon Correctional** ) | | |
| (Warden, Superintendent, or authorized **Center** ) | | |
| person having custody of petitioner) | ) | |
| | ) | |
| RESPONDENT, and | ) | |
| | ) | |
| **(Fill in the following blank only if judgment** | ) | |
| **attacked imposes a sentence to commence** | ) | |
| **in the future)** | ) | |
| | ) | |
| ATTORNEY GENERAL OF THE STATE OF | ) | Case Number of State Court Conviction: |
| | ) | This involves a prison disciplinary |
| | ) | action which resulted in the loss |
| _____ | ) | of Petitioner's Good Conduct Credits; |
| (State where judgment entered) | ) | therefore, there is no "Case Number." |

## PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: Prisoner Review Board, 319 E. Madison Street, Suite A, Springfield, Illinois 62701

2. Date of judgment of conviction: March 13, 2002

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

   "Filed a lawsuit that was ordered to be frivolous."

4. Sentence(s) imposed: Revocation of six (6) months of Petitioner's Good Conduct Credits.

5. What was your plea? (Check one)     (A) Not guilty     ( X )
                                        (B) Guilty         (   )
                                        (C) Nolo contendere (   )

   If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

   N/A

Revised: 7/20/05

**PART I – TRIAL AND DIRECT REVIEW**

1. Kind of trial: (Check one):        Jury ( )        Judge only ( )    This was a prison disci-
plinary matter; therefore, there was no "trial."

2. Did you testify at trial?        YES ( )        NO    ( X )  I was denied my right to
a hearing before the Prisoner Review Board--they convicted me without a hearing!

3. Did you appeal from the conviction or the sentence imposed? YES ( X ) NO ( )

    (A)  If you appealed, give the

        (1)  Name of court:   Circuit Court of Lee County, Illinois   (Case No. 02-MR-53)

        (2)  Result:    State's Motion to Dismiss granted; case was dismissed.

        (3)  Date of ruling:   Final Judgment entered April 21, 2003.

        (4)  Issues raised:   Petitioner challenged the statutory scheme pursuant to which he
was prosecuted on the grounds that it was:  (1) facially unconstitutional; (2) uncon-
stitutionally applied to him in violation of his rights to equal protection and due
process, etc.  Petitioner also claimed that the disciplinary proceedings violated
his right to procedural and substantive due process and that it was a retaliatory
                                                      and vindictive prosecution.

    (B)  If you did not appeal, explain briefly why not:
Note: Petitioner appealed the Circuit Court's dismissal to the Illinois Appellate
Court, Second District, Case No. 2-03-0428.  The appeal was dismissed on jurisdic-
tional grounds because Petitioner's Notice of Appeal was filed prematurely, albeit
pursuant to the instructions he received from the Circuit Court Judge (which turned out

4. Did you appeal, or seek leave to appeal, to the highest state court? YES ( X )        NO ( )    to be wrong).

    (A)  If yes, give,

        (1)  Result:  Motion for Supervisory Order denied; Petition for Leave to Appeal
                        also denied.

        (2)  Date of ruling: Motion for Supervisory Order denied on 11-19-04; PLA denied 1-26-05.

        (3)  Issues raised:  The appellate court erred in dismissing Petitioner's appeal
pursuant to its finding that it lacked jurisdiction because it misapprehended the
Illinois Supreme Court's decision in Ferguson v. Riverside Medical Center, 111 Ill.2d
436 (1985) and failed to follow United States Supreme Court precedent governing the
construction of pro se pleadings.

    (B)  If no, why not:   _____

5. Did you petition the United States Supreme Court for a writ of *certiorari*? Yes ( )  No ( X )

    If yes, give (A) date of petition: _____ (B) date *certiorari* was denied:  _____

Note: Petitioner refiled his case in Lee County on 3-3-05.  It was dismissed on
4-27-06 (Lee County Case No. 05-MR-13.).  Petitioner again appealed to the Illinois
Appellate Court on 4-29-06 and was assigned Case No. 2-06-0453.  The Appellate
Court affirmed the Lee County Court's decision in a Rule 23 Order filed on 6-26-07.
Petitioner then filed a Petition for Leave to Appeal to the Illinois Supreme Court,
which denied his Petition on 1-30-08.  Petitioner raised the same issues as he
raised in the prior action and they are the same issues raised in this Petition,
as noted infra.

Revised: 7/20/05

## PART II – COLLATERAL PROCEEDINGS

1.  With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

    YES ( )   NO (X)

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

    A.  Name of court: _____

    B.  Date of filing: _____

    C.  Issues raised: _____

    _____

    _____

    D.  Did you receive an evidentiary hearing on your petition?     YES ( )   NO ( )

    E.  What was the court's ruling?     _____

    F.  Date of court's ruling:     _____

    G.  Did you appeal from the ruling on your petition?     YES ( )   NO ( )

    H.  (a)   If yes,  (1) what was the result?     _____

        (2) date of decision:     _____

    (b)   If no, explain briefly why not: _____

    I.  Did you appeal, or seek leave to appeal this decision to the highest state court?

        YES ( )   NO ( )

        (a)   If yes,  (1) what was the result?     _____

            (2) date of decision:     _____

        (b)   If no, explain briefly why not: _____

Revised: 7/20/05

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?    YES ( )        NO ( X )

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1.    Nature of proceeding        _____

        2.    Date petition filed          _____

        3.    Ruling on the petition       _____

        4.    Date of ruling             _____

        5.    If you appealed, what was the ruling on appeal?    _____

        6.    Date of ruling on appeal     _____

        7.    If there was a further appeal, what was the ruling ?    _____

        8.    Date of ruling on appeal     _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?    YES ( )   NO ( X )

    A. If yes, give name of court, case title and case number: _____

_____

    B. Did the court rule on your petition? If so, state

        (1) Ruling:    _____

        (2)   Date:    _____

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?    YES ( )        NO ( X )

    If yes, explain: _____

_____

Revised: 7/20/05

**PART III – PETITIONER'S CLAIMS**

1.    State <u>briefly</u> every ground on which you claim that you are being held unlawfully.  Summarize <u>briefly</u> the <u>facts</u> supporting each ground.  You may attach additional pages stating additional grounds and supporting facts.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

    (A)    Ground one    Illinois' statutory scheme at 730 ILCS 5/3-6-3(d) and 730 ILCS
                  Supporting facts (tell your story <u>briefly</u> without citing cases or law):

5/3-3-2(a)(8)--the statutory scheme pursuant to which Petitioner was convicted--is

unconstitutionally vague and overbroad in violation of Petitioner's rights under

the First and Fourteenth Amendments to the United States Constitution.

(The supporting facts begin on page 8, infra.)

    (B)    Ground two    The statutory scheme at 730 ILCS 5/3-6-3(d) and 730 ILCS 5/3-3-2(a)(8)
                  Supporting facts:

was unconstitutionally applied to Petitioner, in violation of his rights under

the First and Fourteenth Amendments to the United States Constitution.

(The supporting facts begin on page 12, infra.)

5

Revised: 7/20/05

(C) Ground three  Petitioner's Good Conduct Credits were revoked in a manner which
Supporting facts:

violated his right to due process, as guaranteed to him by the Fourteenth

Amendment to the United States Constitution.

(The supporting facts begin on page 26, infra.)

 

(D) Ground four  The Illinois Appellate Court's application of 730 ILCS 5/3-6-3(d)
Supporting facts:

and 730 ILCS 5/3-3-2(a)(8) to the facts present in Petitioner's case is in direct

conflict with its application of the aforementioned statutes to the substantially

similar facts present in People v. Kelly, No. 2-04-0574 (Rule 23 Order dated

July 16, 2007), and, as a result, violates Petitioner's Constitutional rights

to due process and equal protection.

(The supporting facts begin on page 30, infra.)

 

2.  Have all grounds raised in this petition been presented to the highest court having jurisdiction?

   YES ( X)  NO ( )

3.  If you answered **"NO"** to question (2), state briefly what grounds were not so presented and why not:

Revised: 7/20/05

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:    I was not represented by an attorney, I had to represent myself due to my indigency.

(A) At preliminary hearing _____

(B) At arraignment and plea _____

(C) At trial _____

(D) At sentencing _____

(E) On appeal _____

(F) In any post-conviction proceeding _____

(G) Other (state): _____


## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )   NO ( X )

Name and location of the court which imposed the sentence: _____

Date and length of sentence to be served in the future _____


   WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: _April 21, 2008_
               (Date)                                 _____
                                                      Signature of attorney (if any)


                                                      **I declare under penalty of perjury that the foregoing is true and correct.**

                                                      _____
                                                      (Signature of petitioner)

                                                      B-02148_____
                                                      (I.D. Number)

                                                      P.O. Box 1200_____
                                                      (Address)
                                                      Dixon, Illinois    61021-1200

Revised: 7/20/05

## SUPPORTING FACTS

**Prefatory Note:** Although not required to do so, Petitioner has cited to the Common Law Record in the State case in support of the facts set forth _infra_. Petitioner does not have access to the original Common Law Record, but will cooperate with this Court in acquiring it (it is likely that the Court will have to order the State to produce it).

**Ground one:** ILLINOIS' STATUTORY SCHEME AT 730 ILCS 5/3-6-3(d) and 730 ILCS 5/3-3-2(a)(8)--THE STATUTORY SCHEME PURSUANT TO WHICH PETITIONER WAS CONVICTED--IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Both 730 ILCS 5/3-6-3(d) and 730 ILCS 5/3-3-2(a)(8) were created by the Illinois General Assembly via Public Act (P.A.) 89-656 § 15, which became effective on January 1, 1997, and was entitled "CRIMES AND CRIMINAL PROCEDURE--CONFINEMENT OF MINORS, ESCAPE AND FRIVOLOUS PRISONER LAWSUITS." These statutes are located in Illinois' Code of Corrections. Section 3-3-2(a)(8) authorizes Illinois' Prisoner Review Board (PRB) to revoke up to 180 days of a prisoner's Good Conduct Credits in the event that a **LAWSUIT** filed by that prisoner is dismissed by the Court as frivolous. Section 3-6-3(d) describes the circumstances under which--and the procedures by which--the Illinois Department of Corrections (IDOC) brings charges against the prisoner before the PRB, thereby triggering the hearing and ultimate disposition authorized by Section 3-3-2(a)(8). Section 3-6-3(d)(1) defines the term "frivolous" and Section 3-6-3(d)(2) defines the term "lawsuit." Copies of these statutes are attached to this Petition as **Exhibits A** and **B**, respectively.

As it was initially passed by the General Assembly, the definition of the term "frivolous" under Section 3-6-3(d)(1) mirrored the language set forth in Rule 11(b)(1)-(4) of the Federal Rules of Civil Procedure, which authorizes **CIVIL** penalties for attorneys and _pro se_ litigants who file a "pleading, written motion, or other paper" with the court which fails to meet the standards set forth in the rule.

Subsequently, the Illinois General Assembly passed Public Act 90-505, which was approved and became effective on August 19, 1997, and was entitled "CORRECTIONS --PRISON--FRIVOLOUS LAWSUITS FILED BY PRISONERS." Section 20 of P.A. 90-505 amended Section 3-6-3(d)(1). The only material change in the definition of "frivolous" was the addition of the phrase "it lacks an arguable basis either in law or in fact." This phrase is taken verbatim from the United States Supreme Court's decision in Neitzke v. Williams, 490 U.S. 319, 325 (1989). Frankly, this phrase is redundant, since a pleading that "lacks an arguable basis either in law or in fact" would most assuredly fail to meet the other criteria set forth in Section 3-6-3(d), particularly subparagraphs (C), (D), and (E). A copy of the amended version of

-8-

730 ILCS 5/3-6-3(d) is attached to this Petition as **Exhibit C.**

Although the definition of "frivolous" set forth in Section 3-6-3(d)(1) is borrowed from Rule 11 of the Federal Rules of Civil Procedure, there are at least **TWO** important differences between the Illinois statute and Rule 11. **First,** Rule 11 authorizes only **CIVIL** sanctions, whereas Illinois' statutory scheme authorizes **CRIMINAL** sanctions in the form of loss of liberty (by extending the amount of time the prisoner must serve in prison by up to 6 months). **Second,** Rule 11 contains a mens rea or notice requirement (a.k.a. the "safe harbor" provision), which is conspicuously absent from Section 3-6-3(d).

Approximately 72.3% of male IDOC inmates have not graduated from high school. Approximately 29% of IDOC inmates read below the sixth grade level. Approximately two-thirds of IDOC inmates read between the sixth and eighth grade levels. Therefore, nearly 96% of the IDOC's prisoners read at the eighth grade level or below!

According to literacy expert Dr. Joanne Carlisle, however, one must possess **AT LEAST AN ELEVENTH GRADE READING ABILITY** to understand the various Illinois state statutes which affect prisoners. Therefore, the overwhelming majority of Illinois' prisoners—at least 95.67% of them—**CAN NOT POSSIBLY UNDERSTAND THE STATUTORY SCHEME AT ISSUE!**

On November 1, 2001, Petitioner received two Inmate Disciplinary Reports (IDR) charging him with violating 730 ILCS 5/3-6-3(d). C-482, 484. The IDRs were based on two Orders issued by United States District Court Judge Harold A. Baker (of the Central District of Illinois) dismissing as frivolous two **motions** for sanctions filed by Petitioner in the case of Eichwedel v. Snyder, et al., Case No. 01-CV-3044. C-469, 480. The Orders were dated October 9, 2001 and October 29, 2001. Neither Order referenced 730 ILCS 5/3-6-3(d) and neither Order defined "frivolous." The October 9th Order termed "frivolous" **ONE** argument in Petitioner's first motion for sanctions, but did not address the other arguments in that motion. C-469. The October 29th Order contained **NO** rationale whatsoever! C-480. Neither Order was a final, appealable Order, and the case remained pending before Judge Baker following the issuance of these Orders. Nevertheless, Petitioner was found guilty of the charges leveled against him in the IDRs and on November 21, 2001, Warden Jerry Sternes recommended that the PRB revoke six (6) months of Petitioner's Good Conduct Credits. (For additional details regarding the disciplinary hearing, the evidence presented by Petitioner, and the action taken by the IDOC, see the facts set forth in support of Ground two, infra, which are incorporated herein by reference thereto.) (Note: In an Order dated November 8, 2001, Judge Baker held that Petitioner did

**NOT KNOWINGLY** and **INTENTIONALLY** make a frivolous argument (C-511); nevertheless, the IDOC continued to prosecute Petitioner even after becoming aware of this holding, which proves that they interpret this statutory scheme as lacking a mens rea or knowledge requirement.)

On February 19, 2002, Petitioner met with PRB member Anthony A. Agee and his clerk (identified only as "Stan" but upon information and belief it is likely that his full name is Stan Parbs) regarding the revocation of Petitioner's Good Conduct Credits. C-019. Petitioner asked Mr. Agee and "Stan" for their interpretation of the statute which governed the revocation hearing, i.e., 730 ILCS 5/3-3-2(a)(8). Id. In response, they indicated that they interpreted the statute literally, i.e., that the revocation of Good Conduct Credits was limited to situations where the Court had dismissed a prisoner's **LAWSUIT** as frivolous. Id. Petitioner then pointed out the fact that his **LAWSUIT** had **NOT** been dismissed as frivolous, only two motions regarding matters tangential to the lawsuit. C-020. Petitioner then questioned whether this matter was properly before the PRB, given Mr. Agee's and Stan's interpretation of the relevant statute. Id. Mr. Agee told Petitioner that he had raised a very legitimate question and indicated that he would grant Petitioner a continuance until March 19, 2002, at which time Mr. Agee would review copies of the pleadings at issue (i.e., the allegedly frivolous motions and the other pleadings relevant to the issue of their purported frivolity) and would answer Petitioner's questions. Id.

On or about March 13, 2002, after seeking (and apparently receiving) "guidance" and "advice" from the PRB's attorney, Mr. Agee reversed his position, agreed with the IDOC's interpretation, and approved the revocation of six months of Petitioner's Good Conduct Credits—even though Petitioner's **LAWSUIT** had **NOT** been dismissed as frivolous! C-625. (The Revocation Recommendations reflect the following hand-written notations: "Refer to the PRB attorney for guidance." and "This matter is referred to the PRB legal attorney for advice.") It should be noted that according to the Twenty-third Annual Report of the Prisoner Review Board, Mr. Agee has a B.A. from Northern Illinois University and over 25 years of experience in criminal justice, including positions with the Illinois Department of Corrections. Nevertheless, the record clearly reflects the fact that Mr. Agee felt it necessary to consult with an **ATTORNEY** for **GUIDANCE** and **ADVICE** regarding both the proper interpretation of the statutory scheme in question and the application of that statutory scheme to Petitioner's case!

A similar incident took place on or about August 17, 2004, during Dixon Correctional Center inmate James Kelly's hearing before the PRB regarding the IDOC's charge that Mr. Kelly had violated 730 ILCS 5/3-6-3(d). C-033. Initially,

Mr. Kelly's hearing was assigned to PRB member Geraldine Tyler. Id. According to the 27th Annual Report of the State of Illinois Prisoner Review Board, Ms. Tyler:

> has over 25 years experience in the criminal justice field, including spending the last 13 years with the Cook County Adult Probation Department, where she was employed as a probation officer and Executive Assistant to the Chief Probation Officer. She also served as an Adjunct Professor at several colleges and universities, with the most recent being Lewis University, and Prairie State College. She earned a Master's Degree in Corrections/Criminal Justice from Chicago State University in 1992. She is a member of Delta Sigma Theta Sorority, and active in local community afairs.

Shortly after Mr. Kelly began presenting his defense against the charges brought by the IDOC, Ms. Tyler cut him off because--as she explained it to him--she **did NOT UNDERSTAND** the statutory scheme pursuant to which Mr. Kelly had been charged and she did **NOT**, therefore, **UNDERSTAND** the arguments Mr. Kelly was presenting in his defense. C-034. Mr. Tyler then called PRB member Thomas L. Johnson over to the table and asked him to handle Mr. Kelly's hearing because **IN SPITE OF HER IMPRESSIVE CREDENTIALS AND EDUCATIONAL BACKGROUND, SHE FELT THAT SHE DID NOT UNDERSTAND THE ISSUE WELL ENOUGH TO AFFORD MR. KELLY A PROPER HEARING!** Id. She told Mr. Kelly that **SINCE MR. JOHNSON WAS AN ATTORNEY**, he was better able to understand the issue and, therefore, was more likely to understand Mr. Kelly's arguments. Id. Mr. Johnson then replaced Ms. Tyler and the hearing proceeded. Id. Mr. Johnson ultimately approved the revocation of six (6) months of Mr. Kelly's Good Conduct Credits after finding him guilty of violating 730 ILCS 5/3-6-3(d). It should be noted that according to the 27th Annual Report of the State of Illinois Prisoner Review Board, Mr. Johnson:

> earned his Bachelor's Degree from the University of Michigan and a Doctorate of Law from DePaul University. He served as an Assistant State's Attorney in DuPage County where he became Chief of the White Collar Crime Division. He was an instructor at the College of DuPage during this period as well as teaching a course on crime scene investigations. He was a founding partner in the law firm of Johnson, Westra et al., where he continued in the private practice of law until taking office as the State Representative for the Illinois 50th District. He served ten years in the Illinois House where he chaired the House Judiciary Committee and was Chairman and Co-Chairman of the Illinois Prison Reform Committee. He has a passion for criminal justice reform so that the recidivism rates can be reduced. He has served on numerous boards, task forces, and community organizations. He remains a member of the Illinois Juvenile Justice Initiative.

In a Rule 23 Order issued by the Illinois Appellate Court for the Second Judicial District in People v. Kelly, No. 2-04-0574, on July 16, 2007, the Court **REVERSED** PRB member--and **ATTORNEY**--Tom Johnson's decision and found that Mr. Kelly had **NOT** violated 730 ILCS 5/3-6-3(d)! Apparently Tom Johnson, an experienced

ATTORNEY AND LEGISLATOR, GOT IT WRONG!

Given these facts, it is clear that the statutory scheme at issue is uncon-
stitutionally vague and overbroad. It is written in language that AT LEAST 95.67%
OF ILLINOIS' PRISONERS CANNOT POSSIBLY UNDERSTAND! In fact, apparently even
COLLEGE-EDUCATED, EXPERIENCED PENOLOGISTS AND EDUCATORS CANNOT UNDERSTAND IT!
One had to seek "guidance" and "advice" from an attorney; the other simply referred
the entire matter to an attorney--WHO GOT IT WRONG ANYWAY! (As did the Circuit
Court Judge who made the initial finding!) Moreover, the statutory scheme lacks
any mens rea or notice requirement, in stark contrast to the Federal Rule from
which it borrows its language! Furthermore, it contains insufficiently clear
standards for those who enforce it and is written so broadly that it infringes
on constitutionally protected rights (specifically, the rights to due process
and access to the courts). For these reasons, it should be declared unconstitu-
tional by this Court and Petitioner's disciplinary conviction should be vacated
and his Good Conduct Credits ordered restored by this Court.

Ground two:  THE STATUTORY SCHEME AT 730 ILCS 5/3-6-3(d) AND 730 ILCS 5/3-3-2(a)(8)
WAS UNCONSTITUTIONALLY APPLIED TO PETITIONER, IN VIOLATION OF HIS RIGHTS UNDER
THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

On February 12, 2001, Petitioner filed Eichwedel v. Snyder, et al., Case
No. 01-CV-3044 (in the U.S. District Court for the Central District of Illinois),
a Civil Rights Complaint (pursuant to 42 U.S.C. § 1983) against 23 employees of
the IDOC, in which he claimed that the defendants (hereinafter, the Snyder defen-
dants) had violated his constitutional rights by, inter alia punishing him in
retaliation for his having exercised his rights under the First Amendment. C-265-
350. Simultaneously, Petitioner filed a Petition and Affidavit for Leave to
Proceed In Forma Pauperis pursuant to 28 U.S.C. § 1915. C-351-358. In a Schedul-
ing Order dated March 30, 2001, the Court granted Petitioner leave to proceed in
forma pauperis AND ordered the Snyder defendants to "answer or otherwise respond
to the Plaintiff's complaint . . . ." C-360-361.

On July 16, 2001, the Snyder defendants filed a Motion to Dismiss Petitioner's
Complaint and a Memorandum of Law in support thereof. C-365-390. In response,
Petitioner filed his first motion for sanctions, pursuant to Rule 11 of the
Federal Rules of Civil Procedure, in which he alleged that the Snyder defendants
(and their attorney) misrepresented facts, misrepresented the law, and misquoted
authority in their motion to dismiss. C-392-395. Simultaneously, Petitioner
filed a Memorandum of Law in Support of his motion for sanctions. C-397-435.
Specifically, Petitioner claimed that the Snyder defendants:

1.  attempted to support their claim that Petitioner's Complaint was barred by the statute of limitations by misstating the date on which it was actually filed and by claiming that Petitioner's cause of action accrued no later than December 31, 1998, because Petitioner did not allege conduct on the part of the Snyder defendants subsequent to December 31, 1998 (C-378-379 & 399-401);

2.  ignored the abundant body of case law governing the tolling of the statute of limitations upon the filing of an application to proceed in forma pauperis (C-378-379 & 399-401);

3.  ignored dispositive authority regarding supervisory liability--an important claim in Petitioner's Complaint (C-375-376 & 402-408);

4.  misstated the United State's Supreme Court's holding in Shaw v. Murphy, 532 U.S. 223 (2001) by claiming that it held that inmates have **NO** constitutionally protected right to assist each other with their legal problems (they also ignored the fact that the IDOC's Departmental Rules specifically vest prisoners with that right--see 20 Ill.Adm.Code § 430.30) (C-381-384 & 409-414);

5.  claimed falsely that Petitioner had not stated any factual allegations of personal involvement on the part of at least eight Snyder defenants (C-375-376 & 402-408);

6.  claimed falsely that Petitioner "publicly insult[ed] a warden and an assistant warden." Memorandum In Support of [the Snyder defendants'] Motion to Dismiss, page 9 (C-378 & 414-419);

7.  claimed falsely that Petitioner's Complaint allaged a violation of his right to privacy (C-380-381 & 422-424);

8.  claimed falsely that Petitioner's 8th Amendment claim was based **SOLELY** upon **ONE** missed appointment with a psychologist (C-384-388 & 420-422); and,

9.  claimed falsely that Petitioner never alleged that the Snyder defendants committed retaliatory acts against the Petitioner (C-379-380 & 424-426).

In addition, Petitioner argued that the Court's decision to grant him leave to proceed in forma pauperis implied a finding by the Court that his Complaint stated a claim upon which relief could be granted.  C-397-398.  Petitioner based this argument on a Memorandum issued by Chief U.S. District Judge Michael M. Mihm on July 9, 1996, in which Judge Mihm stated:  "federal Courts must deny leave to proceed in forma pauperis if the complaint fails to state a claim upon which relief may be granted."  C-476.  Petitioner argued further that the Court's order that

the Snyder defendants "answer or otherwise respond to the Plaintiff's complaint" implied a finding by the Court that the Petitioner had a reasonable opportunity to prevail on the merits.  C-398-399.  Petitioner based this argument on the plain language of 42 U.S.C. § 1997e(g)(2), which states:  "The court may require any defendant to reply to a complaint brought under this section **IF** it finds that the plaintiff has a **REASONABLE OPPORTUNITY TO PREVAIL  ON THE MERITS.**"  (Emphasis added.)

     In his supporting memorandum, Petitioner argued that given the findings implicit in the Court's Scheduling Order, the Court had, in effect, made and ruled on its own motion to dismiss his Complaint prior to ordering service upon the Snyder defendants; therefore, Petitioner argued, "Defendants filed what amounts to a repetitive Motion to Dismiss in which they advanced frivolous legal arguments and engaged in unthical [sic] advocacy, . . . ."  C-399.

     On September 12, 2001, the Snyder defendants filed Defendants' Response to Plaintiff's Motion for Sanctions.  C-437-446.  In response, Petitioner filed his second motion for sanctions (and a Memorandum of Law in support thereof), in which he alleged that in their response, the Snyder defendants again misstated facts, mischaracterized Petitioner's claims and misrepresented the law applicable thereto. C-448-465.  Specifically, Petitioner claimed that the Snyder defendants:

     1.  misrepresented the current state of the law governing the granting of leave to proceed in forma pauperis (C-438-439 & 451-453);

     2.  misstated the 7th Circuit Court of Appeals' holding in Carroll v. Tucker, 2001 U.S. App. LEXIS 14044, claiming that it held that inmates can be disciplined for making unflattering remarks about staff in letters to third parties (i.e., in outgoing mail to third parties in the free society) (C-442-443 & 457-461);

     3.  claimed falsely that Petitioner had not stated authority in support of his position (C-438-439, 451, 455 & 461-462);

     4.  claimed falsely that Petitioner had cited very little authority from the 7th Circuit Court of Appeals or the United States Supreme Court (C-440-441, 454-455 & 461-462); and,

     5.  claimed falsely that Petitioner had violated IDOC rules by possessing legal materials which belonged to other inmates—a claim flatly contradicted by the very disciplinary report written by one of the Snyder defendants, a copy of which had been attached to Petitioner's Complaint as an Exhibit. C-312-315, 441-442 & 456.

Subsequent to mailing his second motion for sanctions, Petitioner received

Judge Baker's October 9, 2001 Order, in which he denied Petitioner's first motion for sanctions, characterizing as frivolous Petitioner's argument that the Court's "granting of in forma pauperis status to the plaintiff amounts to a favorable screening under 28 U.S.C. § 1915A." C-469. Judge Baker claimed that he had "not yet conducted a merit review of the plaintiff's complaint under 28 U.S.C. § 1915A." Id. Therefore, according to Judge Baker, the factual premise upon which Petitioner had based his argument was incorrect. In his ruling, Judge Baker did not address the fact that Petitioner had based his argument on Judge Mihm's July 9, 1996 Memorandum. In addition, **Judge Baker did NOT ADDRESS THE OTHER ARGUMENTS advanced by Petitioner in his motion!**

On October 23, 2001, Petitioner filed a Motion to Alter or Amend Judgment, to which he attached a copy of Judge Mihm's Memorandum. C-471-478. In addition to asserting that said Memorandum provided a reasonable factual and legal basis for his argument, Petitioner noted that he had raised several other arguments in his motion which the Court had failed to address.

In a one-sentence Minute-Entry dated October 29, 2001, Judge Baker denied as frivolous Petitioner's second motion for sanctions without providing any rationale for his decision. C-480.

On November 1, 2001, Petitioner received two Inmate Disciplinary Reports (IDR) charging him with violating 730 ILCS 5/3-6-3(d), one referencing Judge Baker's October 9, 2001 Order and the other referencing his October 29, 2001 Minute-Entry. C-482-484. The IDRs were written by Mr. Curt Eubanks, one of the Snyder defendants (who eventually admitted to Petitioner that he had not read the allegedly frivolous motions prior to writing the IDRs and who also eventually admitted that at least some of the allegations leveled against the Snyder defendants in Petitioner's motions for sanctions were **TRUE**, and therefore not frivolous) and approved by Capt. Jeff Hughes, another Snyder defendant!

On November 2, 2001, the Snyder defendants filed their response to Petitioner's Motion to Alter or Amend Judgment, in which they argued that "the order which Plaintiff moves to alter or amend is **NOT A FINAL** ORDER. It is merely an order denying a motion for sanctions." C-488 (emphasis added). As noted on page 17, infra, Petitioner made this same argument to the IDOC's Adjustment Committee!

On November 4, 2001, Petitioner wrote a letter to Adjustment Committee Chairperson Lt. Ernestine Daniels (another Snyder defendant), in which he requested that she call two witnesses in his defense——Judge Baker and IDOC Librarian Carolyn Zee. C-493-494. Petitioner submitted a list of questions for each witness. The questions for Judge Baker were:

1.  When you made these rulings, had you already read **ALL** of the pleadings filed in the case thus far **AND** had you already conducted the screening required by statute?

2.  If so, are your orders final appealable orders, i.e., can the Plaintiff appeal these orders to the Seventh Circuit Court of Appeals **NOW**, or must he wait until the case has been resolved in its entirety, preserve these issues in his post-trial motion, and then appeal them?

3.  If not, would you reconsider your position--at least as to the characterization of Plaintiff's motions as frivolous--**AFTER** you conduct the screening and read **ALL** of the pleadings?

4.  Finally, is your use of the term "frivolous" intended to mean the same thing as that term is defined in the Illinois statute upon which Defendants Eubanks and Hughes are basing their Disciplinary Report?

The questions for Carolyn Zee were:

1.  On or about the month of July, 1996, did you post a copy of a Memorandum signed by then Chief U.S. District Judge Michael M. Mihm (U.S. District Court, Central Dist. of Illinois) entitled "MEMORANDUM TO ALL INMATE LITIGANTS RE:  PRISON LITIGATION REFORM ACT:" said memorandum being dated July 9, 1996?

2.  If so, could you please fax me a copy of that memorandum?

3.  If not, is it possible that you do not recall posting a copy of such a memorandum and/or that you do not have a copy of that memorandum anymore?

4.  Do you have an opinion as to the quality of the legal assistance provided by Paul Eichwedel during the time he was working in the law library at Big Muddy?  If so, what is your opinion?

Simultaneously, Petitioner wrote to Judge Baker, posed the same questions to him, and requested that he provide answers to those questions for the Adjustment Committee.  C-504-509.  Petitioner also raised numerous defenses in his letter to Lt. Daniels.  C-494-495.

On November 8, 2001, Judge Baker denied Petitioner's Motion to Alter or Amend Judgment, holding that:  "The court **does NOT DOUBT** that the plaintiff believed he had grounds for his motion, but his subjective beliefs do not determine whether his motion was _legally_ frivolous."  C-511 (emphasis added).  (Note: Since Judge Baker **CLEARLY** held that Petitioner had not **KNOWINGLY** presented a frivolous argument in his motion, the IDOC's continued prosecution of Petitioner --even **after** becoming aware of Judge Baker's holding--demonstrates that they

interpret the statute as lacking a <u>mens rea</u> or knowledge requirement.)  Judge Baker misstated Petitioner's position and claimed that Petitioner failed to cite any "rule or law" in support of his position--apparently overlooking Petitioner's citations to Judge Mihm's Memorandum, case law, and 42 U.S.C. § 1997e(g)(2). Interestingly, Judge Baker did not cite any "rule or law" that **CONTRADICTED** Petitioner's position!

On November 13, 2001, Judge Baker acknowledged receiving Petitioner's letter (dated 11-4-01), construed it as a motion to reconsider or clarify his findings that Petitioner's motions for sanctions were frivolous, and provided the <u>Snyder</u> defendants an opportunity to respond.  C-513.

On November 14, 2001, Petitioner appeared before Adjustment Committee Chairperson Lt. Daniels for his hearing on both IDRs.  At his hearing, Petitioner advanced an argument based on an outline he had prepared prior to the hearing. C-514.  Among other things, Petitioner argued that:

1.  the charges were filed prematurely, given the <u>Snyder</u> defendants' admission (in their Response to Petitioner's Motion to Alter or Amend Judgment, as noted on page 15, <u>supra</u>) that the Orders which formed the basis for the disciplinary charges against Petitioner were **NOT FINAL ORDERS**;

2.  since Judge Baker had not yet ruled on Petitioner's Motion to Alter or Amend Judgment (Petitioner did not receive Judge Baker's November 8, 2001 Order prior to the hearing before the Adjustment Committee), it was premature to hold a hearing on the IDRs;

3.  the <u>Snyder</u> defendants and/or their attorney **HAD LIED** in their Motion to Dismiss and in the accompanying Memorandum;

4.  it was improper for the Adjustment Committee to impose sanctions against Petitioner when Judge Baker never found that Petitioner had violated Federal Rule of Civil Procedure 11 (which, as noted on page 8, <u>supra</u>, is virtually identical to 730 ILCS 5/3-6-3(d)) and had not imposed sanctions upon Petitioner; and,

5.  Petitioner's conduct did not constitute a violation of 730 ILCS 5/3-6-3(d), as evidenced by a review of the pleadings.  C-012-013.

During his hearing, Petitioner gave Lt. Daniels both a copy of Judge Mihm's Memorandum and a copy of the first motion for sanctions in which Petitioner had made his argument based upon Judge Mihm's Memorandum (i.e., the argument Judge Baker had called frivolous).  C-013.  Petitioner argued that in order to determine whether he had violated 730 ILCS 5/3-6-3(d) by filing "frivolous" motions, Lt. Daniels should read those motions and base her decision on their contents,

-17-

taking into consideration the evidence presented by Petitioner during the hear-
ing--particularly Judge Mihm's Memorandum. Petitioner argued further that even
if Judge Mihm had incorrectly stated the law in his Memorandum (as Judge Baker
implied in his October 9th Order), Petitioner should not be punished for relying
upon that Memorandum, given the fact that it had been posted in an IDOC prison
Law Library by IDOC staff (a fact which Lt. Daniels acknowledged had been veri-
fied by Librarian Carolyn Zee), thereby conferring upon it the imprimatur of
accuracy and reliability. Before concluding the hearing, Lt. Daniels acknowledged
receiving Petitioner's letter to her dated November 4, 2001, as well as the
documents attached thereto. C-013.

On November 30, 2001, the Snyder defendants filed their Motion to Strike
Petitioner's letter to Judge Baker, in which they argued that "[t]he issue of
whether Plaintiff's Motions for Sanctions against the Defendants were frivolous
should be decided BASED UPON THE CONTENT OF THOSE PLEADINGS, not upon the conse-
quences to Plaintiff." (Emphasis added.) C-520. Ironically, Petitioner had
made this very same argument both when he appeared before Lt. Daniels (as noted
on pages 17-18, supra) and on page 2 of his November 4, 2001 letter to her. C-494.

On or about December 6, 2001, Petitioner was served with copies of the
Adjustment Committee Final Summary Reports informing him both that his request
to call Judge Baker as a witness had been denied and that he had been found
guilty of the charges brought in both of the IDRs. C-014 & 525-529. The reports
had been signed by the warden or his designee on November 21, 2001.

On January 4, 2002, Petitioner filed a Grievance in which he challenged the
Adjustment Committee's disposition of the charges brought against him in the
IDRs. C-531. In his Grievance, Petitioner presented most of the arguments he
had presented to the Adjustment Committee. Petitioner also presented several
additional arguments, including--but not limited to--the following: the denial
of procedural and substantive due process (which included both facial and as-
applied challenges to the statutory scheme pursuant to which Petitioner had been
prosecuted, and a claim that the Adjustment Committee's refusal to call Judge
Baker as a witness was improper); the Snyder defendants' misconduct, which Peti-
tioner argued DID violate Rule 11 of the Federal Rules of Civil Procedure; and
the fact that punishment was imposed on the basis of Orders which were not final.
C-531-553.

On January 23, 2002, Judge Baker issued an Order in which he answered two
of the questions Petitioner had posed in his November 4th letter. C-575-576.
Judge Baker held that "the court's denial of sanctions is NOT a FINAL, APPEALABLE

ORDER." (Emphasis added.) C-575. In addition, Judge Baker held that "the court has made **NO FINDING** its characterization of the plaintiff's motions as frivolous means the same as the term frivolous under 730 ILCS 5/3-6-3(d)." C-575-576 (emphasis added). In so holding, Judge Baker validated two of the arguments Petitioner had made to Lt. Daniels and the Grievance Officer. More important, Judge Baker **EXPLICITLY DISAVOWED** making the "specific finding" of frivolity pursuant to--and mandated by--730 ILCS 5/3-6-3(d)! Without that "specific finding" **there is NO LEGAL OR EVIDENTIARY BASIS for the disciplinary action taken against Petitioner by the IDOC and PRB!**

On January 25, 2002, Grievance Officer Doug Hoyle (another <u>Snyder</u> defendant) recommended that Petitioner's Grievance be denied and the Warden's designee concurred. C-578. (To the best of Petitioner's knowledge, information and belief, the designee who signed Warden Sternes' name is Administrative Assistant Diane M. Stewart, another <u>Snyder</u> defendant.) Petitioner appealed the Warden's decision to IDOC Director Snyder via the Administrative Review Board (ARB) on February 15, 2002. C-578 & 580-581.

On February 15, 2002, Judge Baker issued an Order in which he granted in part and denied in part the <u>Snyder</u> defendants' motion to dismiss. C-583-595. Since the claims he dismissed were simply alternative claims for relief, none of the <u>Snyder</u> defendants was dismissed from the case. More important, Judge Baker did **NOT** characterize **ANY of the dismissed CLAIMS as FRIVOLOUS!**

Judge Baker's February 15, 2002 Order contains several additional statements, findings of fact, and conclusions of law which validate the other arguments advanced by Petitioner in his motions for sanctions and supporting memoranda (i.e., the arguments Judge Baker did not address in any of his previous orders, including the ones in which he characterized Petitioner's motions as frivolous), and which, as a result, undermine Judge Baker's findings of frivolity. On page 11 of his February 15th Order, for example, Judge Baker **AGREED** with Petitioner that December 31, 1998 was **NOT** the date on which his cause of action accrued and that the statute of limitations did **NOT** bar his claims, as the <u>Snyder</u> defendants had claimed in their Motion to Dismiss. C-593. In so finding, Judge Baker provided an arguable basis for one of the claims made by Petitioner in his first motion for sanctions and supporting memorandum (see subparagraph #1 on page 13, supra), thereby rendering it **NOT** frivolous!

Similarly, on pages 10-11 of his February 15th Order, Judge Baker found that Petitioner **HAD** alleged facts regarding the personal involvement of each and every <u>Snyder</u> defendant in the violations of Petitioner's constitutional rights sufficient

-19-

to preclude the dismissal of **ANY** of these defendants! C-592-593. (Defendants had claimed otherwise in their motion to dismiss.) In addition, Judge Baker **AGREED** with Petitioner's legal argument regarding supervisory liability! In so finding and holding, Judge Baker provided an arguable basis for two additional claims made by Petitioner in his first motion for sanctions and supporting memorandum (see subparagraphs #3 and #5 on page 13, supra), thereby rendering them **NOT** frivolous!

On pages 6-7 of his February 15th Order, Judge Baker held that Petitioner **HAD** alleged retaliatory acts on the part of the Snyder defendants in his civil rights complaint, **CONTRARY** to what the Snyder defendants had claimed in their motion to dismiss! C-588-589. In support of his holding, Judge Baker cited some of the **SAME** authority that Petitioner had cited in his memorandum supporting his first motion for sanctions! Once again, Judge Baker's holding provided an arguable basis for one of the claims made by Petitioner in his first motion for sanctions and supporting memorandum (see subparagraph 9 on page 13, supra), thereby rendering it **NOT** frivolous!

While Judge Baker did not specifically find that the Snyder defendants' numerous factual and legal misrepresentations were sanctionable, his February 15th Order provides an arguable basis for **SEVERAL** of the claims made by Petitioner in his first motion for sanctions and supporting memorandum. As a result, it is clear that Petitioner's motion was **NOT** frivolous!

On February 19, 2002, Petitioner met with PRB member Anthony A. Agee and his clerk "Stan" (whose full name is Stan Parbs, according to those familiar with the PRB) regarding the revocation of Petitioner's Good Conduct Credits recommended by IDOC Director Snyder. C-019. Petitioner informed Mr. Agee that he was not prepared for his hearing because he had received notice of the hearing only four days earlier. Id. Petitioner indicated that he wanted to submit copies of the relevant pleadings to Mr. Agee for his review, but was unable to obtain them due to the lack of reasonable notice. Mr. Agee acknowledged Petitioner's right to submit such documentation in his defense and told Petitioner that he would grant him a continuance to March 19, 2002, at which time he would review the copies of the pleadings Petitioner wished to submit and hear Petitioner's arguments before deciding Petitioner's case. Id. (For additional details of this meeting, see the facts supporting Ground one, page 10, supra.)

On March 9, 2002, Petitioner sent a letter to PRB Chairwoman Anne R. Taylor, in which he recounted the facts surrounding his February 19th meeting with Mr. Agee, asked Ms. Taylor several questions regarding his case, and requested a

response.  C-597-599.

On March 19, 2002, in response to an inquiry from Petitioner, Dixon Correctional Center staff informed him that he was **NOT** on the PRB's hearing docket for that day (which was the date to which PRB member Agee had continued his case). C-021.

On March 25, 2002, Dixon Correctional Center's Records Office informed Petitioner that IDOC Director Snyder had revoked six (6) months of his Good Conduct Credits on March 18, 2002.  C-021.  (Petitioner eventually learned that the PRB had approved the IDOC's Revocation Recommendation on March 13, 2002.)

On April 5, 2002, Petitioner filed a Grievance in which he claimed, inter alia, that Snyder revoked his Good Conduct Credits in a manner which not only violated several state statutes and Illinois Administrative Code sections, but also violated Petitioner's constitutional rights to procedural and substantive due process.  (The specific state statutes and Illinois Administrative Code sections are identified in the statements of fact supporting Ground three, infra.) C-609-610.

On April 9, 2002, Petitioner again wrote to PRB Chairwoman Taylor, requesting a response to his letter of March 9, 2002, and noting the fact that he did not have his hearing with Mr. Agee on March 19, 2002--the date to which it had been continued.  C-615.  Petitioner requested his hearing and/or any information regarding the disposition of the charges filed against him by the IDOC.

On April 22, 2002, Petitioner was interviewed by ARB Chairperson Sheila M. Love regarding his Grievance challenging the disposition of the two IDRs (i.e., the Grievance filed on 1-4-02 and denied on 1-25-02).  C-022.  During the interview, in addition to repeating the arguments he had made to the Adjustment Committee, the Grievance Officer (in his Grievance) and the ARB (in the letter he submitted along with his Grievance appeal), Petitioner presented additional evidence favorable to his position, which had not been available to him prior to his appearance before the Adjustment Committee.  Id.  This evidence included the three Orders by Judge Baker (dated 11-8-01, 1-23-02 and 2-15-02) which Petitioner received after his hearing before the Adjustment Committee.  Petitioner argued that the findings of fact and other statements made by Judge Baker in these three Orders undermined the Adjustment Committee's findings of guilty.

Following his interview with Ms. Love, and again on May 14, 2002, Petitioner discussed the matter with Mr. Curt Eubanks, who had written the IDRs in question. C-022.  Mr. Eubanks admitted that he had **NOT** read the pleadings upon which the IDRs were based, prior to issuing them.  C-023.  Upon reading copies of those

pleadings, which were provided by Petitioner, Mr. Eubanks **ADMITTED** that the Snyder defendants (or at least their attorney) **HAD MISREPRESENTED A NUMBER OF FACTS IN THEIR PLEADINGS**, as Petitioner had claimed in his motions for sanctions! C-024 & 028-029.  Given Mr. Eubanks' admission, it is clear that Petitioner's motions were **NOT** frivolous!

During his conversation with Petitioner, Mr. Eubanks also acknowledged that the IDOC could not revoke Petitioner's Good Conduct Credits until **AFTER** Petitioner had his hearing before the Prisoner Review Board.  C-024.

On April 23, 2002, PRB Chairwoman Anne R. Taylor responded to Petitioner's letters (dated March 9th and April 9th) and provided him with a copy of one of the Revocation Recommendations which reflected the action taken by the PRB on March 13, 2002.  C-620-623.  (The Revocation Recommendation is the charging instrument by which the IDOC files its charge against the prisoner with the PRB and makes its recommendation that a certain amount of the prisoner's Good Conduct Credits be revoked.  During the course of litigation in the State courts, Petitioner eventually was provided a copy of the other Revocation Recommendation. C-739.)  On the line calling for a "Description of Offense," it states:  "Filed a **LAWSUIT** that was ordered to be frivolous."  (Emphasis added.)  C-625.  As Judge Baker's February 15, 2002 Order clearly reflects, however, Petitioner's **LAWSUIT** was **NOT** dismissed as frivolous!  As a result, the **EVIDENCE CONCLUSIVELY ESTABLISHES** Petitioner's **ACTUAL INNOCENCE** of the only charge presented to the PRB by the IDOC in its Revocation Recommendation!

In the section of the Revocation Recommendation entitled "PRISONER REVIEW BOARD ACTION," the word "Continuance" is circled, validating Petitioner's claim that Mr. Agee had granted him a continuance at the conclusion of their February 19, 2002 meeting.  C-625.  In her response to Petitioner's letters, PRB Chairwoman Taylor failed to explain why Petitioner was denied his hearing after Mr. Agee granted him a continuance.

On April 25, 2002, ARB Chairperson Love recommended that Petitioner's Grievance appeal be denied and IDOC Director Snyder concurred.  C-627-628.  In her decision, Ms. Love failed to address the arguments advanced by Petitioner both during the hearing and in his Grievance.  She does not say why the additional **EXCULPATORY** evidence presented by Petitioner (i.e., Judge Baker's Orders dated 1-23-02 and 2-15-02), which had not been available either to the Adjustment Committee or the Grievance Officer, does not undermine their decisions.  In fact, Ms. Love's decision reflects **NO** assessment of this **EXCULPATORY** evidence whatsoever!

On May 8, 2002, Grievance Officer Hoyle denied Petitioner's Grievance dated

-22-

April 5, 2002 regarding, inter alia, the revocation of his Good Conduct Credits
by IDOC Director Snyder. C-632. In his report, Mr. Hoyle claimed that Petitioner
is not entitled to a face-to-face interview with the Prisoner Review Board--a
claim which is flatly contradicted by both the statutes governing revocations
of Good Conduct Credits (see 730 ILCS 5/3-6-3(d) and 730 ILCS 5/3-3-2(a)(8)) and
the procedures governing Good Conduct Credit revocations by the PRB, which are
codified at 20 Ill.Adm.Code § 1610.170(c)(2). Id. Warden Sternes' designee,
Casework Supervisor Curt D. Eubanks (who had issued the IDRs which led to the
Good Conduct Credit revocation in the first place), concurred with Grievance
Officer Hoyle's recommendation and signed Warden Sternes' name that same day, in
spite of the fact that he had previously agreed that Petitioner had a right to a
face-to-face hearing before the PRB (see page 22, supra) and in spite of the fact
that he had **ADMITTED** that a number of the arguments in the allegedly frivolous
motions for sanctions filed by Petitioner were **NOT** frivolous, but valid! Id.
(See page 22, supra.)

On May 9, 2002, Petitioner appealed Warden Sternes' decision to IDOC Director
Snyder via the Administrative Review Board. C-632. On June 25, 2002, ARB Chair-
person Love denied Petitioner's Grievance Appeal and Director Snyder concurred
with her decision. C-654.

On August 2, 2002, the Snyder defendants responded in part to Petitioner's
discovery requests in that case. C-030. In "DEFENDANTS' RESPONSE TO PLAINTIFF'S
REQUEST FOR ADMISSION OF FACTS," **ALL 23 SNYDER DEFENDANTS ADMITTED TO THE
FOLLOWING FACTS:**

    1. that what Defendant Hoagland confiscated from Petitioner's cell
on the morning in question were "letters Plaintiff had written to individ-
uals in the free society regarding the property box program." Request for
Admission of Fact #40. C-697-698.

    2. that the factual basis of the Inmate Disciplinary Report written
by Defendant Hoagland on February 23, 1999, was an accurate summary of the
facts supporting the charges leveled against Petitioner in said IDR.
Request for Admission of Fact #49. C-699.

These responses--by all 23 of the Snyder defendants--flatly contradicted what
they said in their response to Petitioner's first motion for sanctions, i.e.,
that Petitioner had violated IDOC rules by possessing legal materials which
belonged to other inmates (see subparagraph #5 on page 14, supra). As a result,
they provide an arguable basis for Petitioner's second motion for sanctions
against the Snyder defendants, thereby rendering it **NOT** frivolous!

Similarly, in <u>Snyder</u> defendant Charles Gobble's response to Interrogatory #8 (propounded by Petitioner), he stated under oath that he **RETURNED TO PETITIONER** the 15 pages of correspondence confiscated from Petitioner's cell by Defendant Hoagland! C-725. Again, Mr. Gobble's verified response flatly contradicts what he and the other <u>Snyder</u> defendants claimed in their response to Petitioner's first motion for sanctions, i.e., that what was confiscated from Petitioner's cell were "legal materials belonging to other inmates." C-441. As Supervisor of the Internal Affairs unit at the Dixon Correctional Center, Mr. Gobble (who was a Captain at that time) certainly would not give Petitioner other inmates' legal materials, particularly when—according to the <u>Snyder</u> defendants—"[t]he Department of Corrections does not allow inmates to possess property belonging to other inmates." <u>Defendants' Response to Plaintiff's Motion for Sanctions</u>, page 6 (<u>Snyder</u> case). C-442. Again, Mr. Gobble's response provides an arguable basis for Petitioner's second motion for sanctions against the <u>Snyder</u> defendants, thereby rendering it **NOT** frivolous!

On May 1, 2003, the IDOC's new Disciplinary Rule #212 became effective. The definition for this rule is: "A pleading, motion, or other paper filed by the offender for which the court, in accordance with 730 ILCS 5/3-6-3, has found to be frivolous." 20 Ill.Adm.Code 504, Appendix A, Rule 212. The IDOC claims that this rule provides "notice" to prisoners sufficient to satisfy due process. C-793. The IDOC also claims that this rule clarifies the conduct being proscribed by 730 ILCS 5/3-6-3(d). <u>Id</u>. Even assuming <u>arguendo</u> that this is true, the prosecution of Petitioner for violating 730 ILCS 5/3-6-3(d) was commenced with the issuance of the IDRs **ON NOVEMBER 1, 2001—**<u>**EIGHTEEN MONTHS PRIOR TO THE DATE UPON WHICH RULE 212 BECAME EFFECTIVE**</u> and **at least** 18 months prior to the date upon which this rule was posted at each prison and/or made available in the prisons' Law Libraries! Surely Petitioner cannot be charged with either actual or constructive knowledge of a rule which did not even exist at the time he allegedly committed the misconduct targeted by that rule; therefore, Petitioner did **NOT** have **either** the "fair notice" or clarification the IDOC claims is provided by Rule 212 (and is mandated by the due process clause of the 14th Amendment to the United States Constitution)!

On October 3, 2003, Judge Baker granted in part and denied in part the <u>Snyder</u> defendants' Motion for Summary Judgment. C-799-810. In his Order, Judge Baker set the trial for January 26, 2004 on Petitioner's three surviving claims against ten (10) remaining <u>Snyder</u> defendants. Given the fact that Petitioner's **LAWSUIT** survived **SUMMARY JUDGMENT**, it is clear that his **LAWSUIT** was **NOT** frivolous!

(Remember, the sole charge listed in the IDOC's Revocation Recommendation to the PRB was that Petitioner "[f]iled a **LAWSUIT** that was ordered to be frivolous." (emphasis added).)

On page 7 of his October 3, 2003 Order (C-805), Judge Baker held that:

> As to defendant Weiner, the court **DISAGREES** that the plaintiff complains **ONLY** that Weiner failed to make **AN** appointment for him. * * * . . . The **RECORD SUPPORTS the PLAINTIFF'S** claims that he requested mental health treatment **SEVERAL TIMES** . . . . [Emphasis added.]

In so holding, Judge Baker provided an arguable basis for the claim made by Petitioner in his first motion for sanctions that the <u>Snyder</u> defendants had misrepresented the facts of Petitioner's case by claiming that his 8th Amendment claim was based **SOLELY** upon **ONE** missed appointment with a psychologist (see subparagraph #8 on page 13, <u>supra</u>). As a result, Petitioner's first motion for sanctions was **NOT** frivolous!

On November 18, 2003, Judge Baker denied Petitioner's request for appointment of counsel in the <u>Snyder</u> case, stating, in pertinent part:

> the record demonstrates that the plaintiff has the ability to prosecute his case on his own behalf. **HIS ARGUMENTS TO THE COURT HAVE BEEN** for the most part, **COGENT AND RELEVANT.** [Emphasis added.] C-813.

While not dispositive of the issue, Judge Baker's finding certainly constitutes evidence relevant to the decision whether to impose sanctions upon Petitioner and how severe those sanctions should be. This evidence was **NOT** available to—or considered by—either the Adjustment Committee or the PRB, as they rushed to judgment before the <u>Snyder</u> case was finalized!

Finally, on or about January 23, 2004, during the final pretrial conference held in the <u>Snyder</u> case, Judge Baker told the parties present for the conference that Petitioner had stated a strong <u>prima facie</u> First Amendment claim. For that reason, he urged both parties to consider settlement. Present for this final, pre-trial conference were Petitioner, <u>Snyder</u> defendant Curt D. Eubanks (who had written the IDRs charging Petitioner with violating 730 ILCS 5/3-6-3(d)), Assistant Attorney General Kelly R. Choate and Assistant Attorney General Christopher L. Higgerson. The parties reached a tentative settlement agreement prior to the date the case was scheduled for trial and they subsequently finalized that agreement on or about March 31, 2004. This additional fact demonstrates conclusively that Petitioner's **LAWSUIT** was not frivolous and that the charges leveled against him by the IDOC and presented to the PRB were without merit! (Again, the **SOLE CHARGE** listed in the IDOC's Revocation Recommendation to the PRB was that Petitioner "[f]iled a **LAWSUIT** that was ordered to be frivolous." (emphasis added).)

The foregoing facts conclusively demonstrate that the IDOC and PRB unconsti-

tutionally applied the statutory scheme at 730 ILCS 5/3-6-3(d) and 730 ILCS 5/3-3-2(a)(8) to Petitioner, in violation of his rights under the First and Fourteenth Amendments to the United States Constitution. These facts conclusively establish Petitioner's actual innocence of the sole charge filed against him by the IDOC in its Revocation Recommendation to the PRB, i.e., that Petitioner "[f]iled a **LAWSUIT** that was ordered to be frivolous." C-625, 739. (Emphasis added.) In addition, however, these facts conclusively establish that Petitioner's two motions for sanctions were **NOT** frivolous, as that term is defined at 730 ILCS 5/3-6-3(d)(1). Furthermore, Judge Baker ultimately **REFUSED** to make the "specific finding" of frivolity required by 730 ILCS 5/3-6-3(d) to trigger the sanctions authorized therein! For these reasons, this Honorable Court should find in favor of Petitioner, declare that the IDOC and PRB unconstitutionally applied the aforementioned statutory scheme to him, and order that his disciplinary conviction be vacated and his Good Conduct Credits restored.

**Ground three:** PETITIONER'S GOOD CONDUCT CREDITS WERE REVOKED IN A MANNER WHICH VIOLATED HIS RIGHT TO DUE PROCESS, AS GUARANTEED TO HIM BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

The facts supporting Ground two also support Ground three. Rather than restate those facts, Petitioner incorporates them herein by reference thereto. Petitioner does, however, emphasize certain facts and supplements others with what follows.

On March 13, 2002, the PRB revoked six (6) months of Petitioner's Good Conduct Credits without affording him the hearing **MANDATED** by 730 ILCS 5/3-6-3(d), 730 ILCS 5/3-3-2(a)(8), 20 Ill.Adm.Code § 1610.170(c)(2) and the due process clause of the Fourteenth Amendment to the United States Constitution. They took this action in spite of the fact that the evidence available to them exonerated Petitioner of the sole charge leveled against him in the IDOC's Revocation Recommendation. In so doing, they denied Petitioner both procedural and substantive due process.

According to the plain language of the statute, 730 ILCS 5/3-6-3(d) is triggered when a "court makes a **SPECIFIC FINDING** that a pleading, motion, or other paper filed by the prisoner is frivolous," as that term is defined in subparagraph (1) of the statute. (Emphasis added.) Upon such a "specific finding," the IDOC is required to conduct a hearing by bringing charges against the prisoner before the PRB; therefore, the IDOC's role in this statutory scheme is similar to that of a prosecutor. The IDOC conducts an administrative hearing (via its Institutional Adjustment Committee) that is similar to a probable cause

hearing or a presentation to a grand jury in the criminal courts.  (There are
some differences, but those differences actually favor the prisoner by vesting
him with rights greater than the rights one normally has in the context of a
probable cause hearing or during presentation of the case to a grand jury.)
Upon a finding similar to a finding of probable cause by a judge or the issuance
of a true bill or indictment by a grand jury, the IDOC files "charges against the
prisoner . . . before the Prisoner Review Board as provided in subparagraph (a)(8)
of Section 3-3-2 of this Code."  730 ILCS 5/3-6-3(d).  The IDOC does this via a
"Revocation Recommendation," which is, in effect, the charging instrument.  This
concludes the IDOC's role.

Section 3-3-2(a)(8) requires the PRB to **"HEAR . . . AND . . . DECIDE** cases
brought by the Department of Corrections against a prisoner in the custody of
the Department **FOR COURT DISMISSAL OF A FRIVOLOUS LAWSUIT** pursuant to Section
3-6-3(d) of this Code."  730 ILCS 5/3-3-2(a)(8) (emphasis added).  According to
20 Ill.Adm.Code § 1610.170(c)(2), the PRB **"WILL give inmates FACE-TO-FACE HEAR-
INGS."**  (Emphasis added.)  If **the PRB** determines that the prisoner is guilty, **IT**
imposes the sentence--revocation of up to 180 days of the prisoner's Good Conduct
Credits.  The PRB's role, then, is similar to that of judge and jury.

As noted on pages 20-23, supra, Petitioner did **NOT** receive the hearing **MAN-
DATED BOTH** by the statutory scheme at issue and by the PRB's own administrative
rules, codified in Illinois' Administrative Code.  After being granted a contin-
uance by PRB member Agee on February 19, 2002, Petitioner **NEVER APPEARED BEFORE
ANY MEMBER OF THE PRB!**  The State has not disputed these facts!

The administrative hearing before the Institutional Adjustment Committee
was also conducted in violation of Petitioner's due process rights.  The IDOC's
Adjustment Committee Hearing Procedures, codified at 20 Ill.Adm.Code § 504.80
were flagrantly violated.  (Note:  While Lt. Daniels is the initial and primary
violator of the various subparagraphs of § 504.80 which are noted in the follow-
ing paragraphs, her violations were ratified and endorsed by IDOC Director Snyder
and his other agents when they approved Lt. Daniels' actions.)

According to 20 Ill.Adm.Code § 504.80(d), "[a]ny person . . . who is other-
wise **not impartial SHALL NOT SERVE** on the Adjustment Committee hearing that
disciplinary report." (Emphasis added.)  Lt. Daniels was a named defendant in
the Snyder case, the case in which Petitioner filed the allegedly frivolous
motions that gave rise to the IDRs which were the subject of the hearing before
the Adjustment Committee.  Clearly, Lt. Daniels was **NOT impartial**, as she had a
vested interest in the outcome of the hearing!  She should have recused herself!

Director Snyder and his agents also failed--or refused--to comply with 20 Ill.Adm.Code § 504.80(g), which mandates that "[t]he Committee **SHALL consider ALL material** presented which is relevant to the issue of whether or not the committed person committed the offense." (Emphasis added.)  As noted on pages 18 and 21-23, supra, it is clear from her decision that Lt. Daniels **IGNORED** the documentary evidence tendered by Petitioner both prior to and during the hearing (not to mention the facts and documentary evidence with which she was personally familiar--she ignored those facts and documents as well)!  By upholding Lt. Daniels' decision, Snyder and his agents ratified and endorsed her misconduct, which violated the aforementioned Departmental Rule.

Director Snyder and his agents also violated 20 Ill.Adm.Code § 504.80(h)(2) when they upheld Lt. Daniels' decision to refuse Petitioner's request to call Judge Baker as a witness and ask him the questions posed by Petitioner.  Lt. Daniels' claim that Judge Baker's testimony would be "cumulative" was spurious on its face, given the fact that her finding of guilty was based exclusively upon Judge Baker's Orders and particularly given the fact that these Orders did not define the term "frivolous" or use language which matched any of the definitions set forth in the statute pursuant to which Petitioner was being prosecuted!

Director Snyder and his agents also violated 20 Ill.Adm.Code § 504.80(j) when they refused to overturn Lt. Daniels' findings of guilty after being presented with Judge Baker's Orders dated January 23, 2002 and February 15, 2002, given the exculpatory evidence contained therein (as noted on pages 18-22, supra).  Section 504.80(j) **MANDATES** that the Adjustment Committee decision be based "upon **ALL** relevant information and evidence.  The Committee must be **REASONABLY** satisfied there is some evidence that the committed person committed the offense for the individual to be found guilty." (Emphasis added.)  No **reasonable** person could read both of the aforementioned Orders by Judge Baker and the pleadings at issue and be "reasonably satisfied" that Petitioner was guilty of violating 730 ILCS 5/3-6-3(d).

Director Snyder and his agents violated 20 Ill.Adm.Code § 504.80(1)(1) when they ignored Lt. Daniels' failure to include in her Final Summary Report the "summary of oral **AND WRITTEN STATEMENTS AND OTHER EVIDENCE PRESENTED**" by Petitioner prior to and during his hearing, which is mandated by that section of the Illinois Administrative Code.  (Emphasis added.)  C-525 & 528.

Director Snyder and his agents violated 20 Ill.Adm.Code § 504.80(1)(2) when they ignored Lt. Daniels' failure to "state the basis for disregarding the [exonerating] evidence" presented by Petitioner both prior to and during his

-28-

hearing.  (See page 21, supra.)  C-525 & 528.

Director Snyder and his agents violated 20 Ill.Adm.Code § 504.80(1)(3) when they ignored Lt. Daniels' failure to state "the reasons for recommending the disciplinary action" in her Final Summary Report.  C-525 & 528.

Director Snyder and his agents violated 20 Ill.Adm.Code § 504.820 (governing grievance procedures for committed persons) when they permitted Doug Hoyle to serve as the Grievance Officer who reviewed Petitioner's Grievances related to the IDRs and the loss of his Good Conduct Credits.  Section 504.820 mandates, in pertinent part, that **"NO** person who is directly **involved** in the subject matter of the grievance, . . . may serve as the Grievance Officer reviewing that particular case." (Emphasis added.)  Mr. Hoyle, like Lt. Daniels, was a named defendant in the Snyder case, the lawsuit in which Petitioner filed the allegedly frivolous motions that gave rise to the IDRs and the subsequent loss of his Good Conduct Credits (see page 19, supra).  Clearly Petitioner's due process rights were violated when Mr. Hoyle served as the Grievance Officer in Petitioner's case.

Both the IDOC and the PRB violated Petitioner's due process rights when they refused to follow the procedures mandated (and the requirements established) by 730 ILCS 5/3-6-3(d) by revoking Petitioner's Good Conduct Credits prior to his hearing before the PRB--a hearing also mandated by 730 ILCS 5/3-3-2(a)(8), as well as by 20 Ill.Adm.Code § 1610.170(c)(2).  As noted on pages 21 and 26, supra, the PRB revoked six (6) months of Petitioner's Good Conduct Credits on March 13, 2002--six days prior to the date to which Petitioner's hearing had been continued by PRB member Agee.

Director Snyder and his agents violated Petitioner's due process rights when they refused to follow the procedures mandated by (and the requirements set forth in) 730 ILCS 5/3-6-3(d), which authorizes the IDOC to bring charges against a prisoner for filing frivolous pleadings **ONLY AFTER** "the court makes a **SPECIFIC FINDING** that a pleading . . . filed by the prisoner is frivolous" as that term is defined by the statute.  (Emphasis added.)  As noted on page 19, supra, Judge Baker's January 23, 2002 Order makes it clear that His Honor had made **NO** such **SPECIFIC FINDING!**

Finally, as noted on page 24 in the facts supporting Ground two, Petitioner was prosecuted prior to the effective date of the IDOC's Departmental Rule #212, which the IDOC claims provides prisoners with both the "fair notice" and the clarification of the conduct being proscribed by 730 ILCS 5/3-6-3(d), that even they acknowledge is required by the due process clause of the Fourteenth Amendment to the United States Constitution.  As a result, since Petitioner did **NOT**

have either the "fair notice" or clarification allegedly provided by this rule, he was prosecuted in violation of his due process rights under the Fourteenth Amendment!

Given the procedures mandated by—and the requirements of—the statutes and the sections of the Illinois Administrative Code cited and quoted supra, and given the facts set forth in the foregoing pages, it is clear that Petitioner's rights to procedural and substantive due process were violated. He was not provided with the "fair notice" mandated by the due process clause of the Fourteenth Amendment. In addition, both the IDOC and the PRB **REFUSED** to follow the numerous procedures designed to protect every prisoner's due process rights. Ultimately, they ignored the mountain of exculpatory evidence that conclusively establishes Petitioner's actual innocence of the charges leveled against him! For these reasons, this Honorable Court should find in favor of Petitioner, declare that the IDOC and PRB violated Petitioner's right to due process under the Fourteenth Amendment to the United States Constitution, and order that Petitioner's disciplinary conviction be vacated and his Good Conduct Credits restored.

**Ground four:** THE ILLINOIS APPELLATE COURT'S APPLICATION OF 730 ILCS 5/3-6-3(d) AND 730 ILCS 5/3-3-2(a)(8) TO THE FACTS PRESENT IN PETITIONER'S CASE IS IN DIRECT CONFLICT WITH ITS APPLICATION OF THE AFOREMENTIONED STATUTES TO THE SUBSTANTIALLY SIMILAR FACTS PRESENT IN PEOPLE V. KELLY, NO. 2-04-0574 (RULE 23 ORDER DATED JULY 16, 2007), AND, AS A RESULT, VIOLATES PETITIONER'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION.

Some of the facts supporting Ground two also support Ground four. Rather than restate those facts, Petitioner incorporates them herein by reference thereto.

One of the issues addressed by the Illinois Appellate Court in its Rule 23 Order in People v. Kelly, No. 2-04-0574 (Rule 23, unpublished Order dated July 16, 2007) was whether the PRB's revocation of six months of Mr. Kelly's Good Conduct Credits pursuant to 730 ILCS 5/3-6-3(d) and 730 ILCS 5/3-3-2(a)(8) was proper. In Kelly, the "trial court . . . found certain **CLAIMS** within the defendant's second amended postconviction petition to be frivolous." Rule 23 Order at 29. Specifically, in its June 17, 2003 Order (which served as the basis for the disciplinary action taken against Kelly), the trial court in Kelly stated that: "'The Court finds that the petitioner's claims in said petition regarding the alleged breach of attorney-client privilege and conflict by Mr. Telander and Ms. Zellner were "frivolous" **AS DEFINED BY** 725 ILCS 5/22--105 and **730 ILCS 5/3-6-3.**'" Rule 23 Order at 28, quoting the trial court's order (emphasis added).

The Illinois Appellate Court held that the trial court's finding of frivolity in Kelly's case was **INSUFFICIENT** to "trigger the removal of good conduct credit

-30-

under section 3-6-3(d) of the Unified Code." Rule 23 Order at 30. The Illinois Appellate Court based its conclusion on its finding that: "Section 3-6-3(d) does not speak in terms of finding **INDIVIDUAL CLAIMS** within a pleading, motion or other filing to be frivolous. The statute speaks solely in terms of finding a pleading, motion, or other filing to be frivolous **IN ITS ENTIRETY**"! Rule 23 Order at 29 (emphasis added). For that reason, the Illinois Appellate Court concluded, "the trial court's finding that **SOME but NOT ALL** of the defendant's claims are frivolous does **NOT** trigger the revocation procedures of section 3-6-3(d)." Rule 23 Order at 30 (emphasis added).

The position taken by the Illinois Appellate Court in <u>Kelly</u> is **IDENTICAL** to the position taken by Petitioner since the IDRs in question were issued against him! On pages 9, 15, 19, 20 and 23-25, <u>supra</u>, Petitioner noted that in the October 9, 2001 Order, Judge Baker termed "frivolous" only **ONE** out of **SEVERAL** arguments advanced by Petitioner in his first motion for sanctions. (As noted on pages 9 and 15, <u>supra</u>, Judge Baker provided **NO** rationale for his October 29, 2001 Minute-Entry.) Petitioner made this very same point to the Illinois Appellate Court on pages 84-85 and 93-94 of his opening brief filed in that Court! Petitioner cited several cases which stand for the proposition that one unreasonable or frivolous argument does not render the entire pleading or motion frivolous. Moreover, as Petitioner has clearly shown in the facts supporting Ground two, the **EVIDENCE** provides an arguable basis for most--if not all--of the claims made by Petitioner in both of his motions for sanctions in the <u>Snyder</u> case.

Given these facts, it is clear that the Illinois Appellate Court's application of Section 3-6-3(d) to Petitioner's case, which is factually and legally indistinguishable from <u>Kelly</u>, conflicts with its decision in <u>Kelly</u> and, as a result, violates Petitioner's rights to due process and equal protection. Since Petitioner and Kelly are similarly situated parties, the Illinois Appellate Court's decision to apply 730 ILCS 5/3-6-3(d) to each of them in a strikingly different fashion for no good reason renders their decision in Petitioner's case unconstitutional.

The State will undoubtedly attempt to distinguish Petitioner's case from <u>Kelly</u> by arguing that Judge Baker found Petitioner's **MOTIONS** to be frivolous. While the word "frivolous" does appear in Judge Baker's Orders, that falls far short of the "specific finding" of frivolity mandated by 730 ILCS 5/3-6-3(d). The trial court's order in <u>Kelly</u> illustrates this point. In <u>Kelly</u>, the trial court found "'that the petitioner's claims in said petition . . . were "frivolous" **AS DEFINED BY . . . 730 ILCS 5/3-6-3**.'" Rule 23 Order at 28, quoting the

trial court's order (emphasis added).  In stark contrast, however, Judge Baker's Orders in Petitioner's case contain **NEITHER** the specific reference to the statute present in the trial court's order in Kelly, **NOR** any language defining the term "frivolous" consistent with the definitions set forth in that statute!

While it is true that in his November 8, 2001 Order, Judge Baker seems to suggest that Petitioner's motions lacked an arguable basis in law or in fact (which is one of the definitions of frivolous set forth in Section 3-6-3(d)(1)), a complete reading of the November 8th Order readily reveals the fact that Judge Baker's use of this phrase is directed at the **SAME ARGUMENT** in Petitioner's **first** motion for sanctions that was termed frivolous in Judge Baker's October 9, 2001 Order. C-511. Once again, however, Judge Baker's November 8th Order does **NOT** address the numerous other arguments advanced by Petitioner in his motions for sanctions and supporting memoranda--arguments Petitioner has demonstrated have merit (see pages 18-20 and 23-26, supra).

More important is the fact that Judge Baker's November 8th Order was not his final word on the subject.  As noted on pages 18-19, supra, in his January 23, 2002 Order, Judge Baker **EXPLICITLY** DISAVOWED making the "specific finding" of frivolity pursuant to--and mandated by--730 ILCS 5/3-6-3(d)! As a result, this leaves us with a finding of frivolity as to **ONE** argument out of **SEVERAL** arguments in **ONE** motion--and even then it is not the "specific finding" of frivolity mandated by 730 ILCS 5/3-6-3(d)!

Applying the Illinois Appellate Court's holding in Kelly to the indistinguishable facts of Petitioner's case leads one to the ineluctable conclusion that since Petitioner's motions were not frivolous in their entirety, they were **NOT** violative of 730 ILCS 5/3-6-3(d)! As a result, the Illinois Appellate Court's decision in Petitioner's case is in direct conflict with its decision in Kelly; therefore, it violates Petitioner's constitutional rights to due process and equal protection, since similarly situated parties must be similarly treated. For these reasons, this Honorable Court should find in favor of Petitioner, declare that his rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution were violated, and order that his disciplinary conviction be vacated and his Good Conduct Credits restored.

730 ILCS 5/3–2–9    **CORRECTIONS**    552

inmate population of the facilities. All statements shall be made available to the public for inspection and copying. P.A. 77–2097, § 3–2–9, added by P.A. 87–417, § 1, eff. Jan. 1, 1992.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 1003–2–9.

## ARTICLE 3. PAROLE AND PARDON BOARD

### 5/3–3–1.  Establishment and appointment of Prisoner Review Board

§ 3–3–1.   Establishment and Appointment of Prisoner Review Board.  (a)  There shall be a Prisoner Review Board independent of the Department of Corrections which shall be:

(1) the paroling authority for persons sentenced under the law in effect prior to the effective date of this amendatory Act of 1977;

(2) the board of review for cases involving the revocation of good conduct credits or a suspension or reduction in the rate of accumulating such credit;

(3) the board of review and recommendation for the exercise of executive clemency by the Governor;

(4) the authority for establishing release dates for certain prisoners sentenced under the law in existence prior to the effective date of this amendatory Act of 1977, in accordance with Section 3–3–2.1 of this Code;

(5) the authority for setting conditions for parole and mandatory supervised release under Section 5–8–1(a) of this Code, and determining whether a violation of those conditions warrant revocation of parole or mandatory supervised release or the imposition of other sanctions.

(b)  The Board shall consist of 12 persons appointed by the Governor by and with the advice and consent of the Senate. One member of the Board shall be designated by the Governor to be Chairman and shall serve as Chairman at the pleasure of the Governor.  The members of the Board shall have had at least 5 years of actual experience in the fields of penology, corrections work, law enforcement, sociology, law, education, social work, medicine, psychology, other behavioral sciences, or a combination thereof.  At least 6 members so appointed must have had at least 3 years experience in the field of juvenile matters.  No more than 6 Board members may be members of the same political party.  Each member of the Board shall serve on a full time basis and shall not hold any other salaried public office, whether elective or appointive.  The Chairman of the Board shall receive $35,000 a year, or an amount set by the Compensation Review Board, whichever is greater, and each other member $30,000, or an amount set by the Compensation Review Board, whichever is greater.

(c)  The terms of the present members of the Prisoner Review Board shall expire on the effective date of this amendatory Act of 1985, but the incumbent members shall continue to exercise all of the powers and be subject to all the duties of members of the Board until their respective successors are appointed and qualified.  The Governor shall appoint 3 members to the Prisoner Review Board whose terms shall expire on the third Monday in January 1987, 4 members whose terms shall expire on the third Monday in January 1989, and 3 members whose terms shall expire on the third Monday in January 1991.  The term of one of the members created by this amendatory Act of 1986 shall expire on the third Monday in January 1989 and the term of the other shall expire on the third Monday in January 1991. Their respective successors shall be appointed for terms of 6 years from the third Monday in January of the year of

appointment.  Each member shall serve until his successor is appointed and qualified.  Any member may be removed by the Governor for incompetence, neglect of duty, malfeasance or inability to serve.

(d)  The Chairman of the Board shall be its chief executive and administrative officer.

P.A. 77–2097, § 3–3–1, eff. Jan. 1, 1973.  Amended by P.A. 78–939, § 1, eff. July 1, 1974;  P.A. 80–1099, § 3, eff. Feb. 1, 1978;  P.A. 83–1177, § 14, eff. July 17, 1984;  P.A. 84–115, § 2, eff. July 29, 1985; P.A. 84–1240, Art. II, § 3, eff. Jan. 1, 1987;  P.A. 85–1433, § 5, eff. Jan. 11, 1989.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 1003–3–1.

### 5/3–3–2.  Powers and duties

§ 3–3–2.  Powers and Duties.

(a)  The Parole and Pardon Board is abolished and the term "Parole and Pardon Board" as used in any law of Illinois, shall read "Prisoner Review Board."  After the effective date of this amendatory Act of 1977, the Prisoner Review Board shall provide by rule for the orderly transition of all files, records, and documents of the Parole and Pardon Board and for such other steps as may be necessary to effect an orderly transition and shall:

(1)  hear by at least one member and through a panel of at least 3 members decide, cases of prisoners who were sentenced under the law in effect prior to the effective date of this amendatory Act of 1977, and who are eligible for parole;

(2)  hear by at least one member and through a panel of at least 3 members decide, the conditions of parole and the time of discharge from parole, impose sanctions for violations of parole, and revoke parole for those sentenced under the law in effect prior to this amendatory Act of 1977; provided that the decision to parole and the conditions of parole for all prisoners who were sentenced for first degree murder or who received a minimum sentence of 20 years or more under the law in effect prior to February 1, 1978 shall be determined by a majority vote of the Prisoner Review Board;

(3)  hear by at least one member and through a panel of at least 3 members decide, the conditions of mandatory supervised release and the time of discharge from mandatory supervised release, impose sanctions for violations of mandatory supervised release, and revoke mandatory supervised release for those sentenced under the law in effect after the effective date of this amendatory Act of 1977;

(4)  hear by at least 1 member and through a panel of at least 3 members, decide cases brought by the Department of Corrections against a prisoner in the custody of the Department for alleged violation of Department rules with respect to good conduct credits pursuant to Section 3–6–3 of this Code in which the Department seeks to revoke good conduct credits, if the amount of time at issue exceeds 30 days or when, during any 12 month period, the cumulative amount of credit revoked exceeds 30 days except where the infraction is committed or discovered within 60 days of scheduled release.  In such cases, the Department of Corrections may revoke up to 30 days of good conduct credit.  The Board may subsequently approve the revocation of additional good conduct credit, if the Department seeks to revoke good conduct credit in excess of thirty days.  However, the Board shall not be empowered to review the Department's decision with respect to the loss of 30 days of good conduct credit for any prisoner or to



EXHIBIT A

increase any penalty beyond the length requested by the Department; and

(5) hear by at least one member and through a panel of at least 3 members decide, the release dates for certain prisoners sentenced under the law in existence prior to the effective date of this amendatory Act of 1977, in accordance with Section 3–3–2.1 of this Code; and

(6) hear by at least one member and through a panel of at least 3 members decide, all requests for pardon, reprieve or commutation, and make confidential recommendations to the Governor; and

(7) comply with the requirements of the Open Parole Hearings Act; [1] and

(8) hear by at least one member and, through a panel of at least 3 members, decide cases brought by the Department of Corrections against a prisoner in the custody of the Department for court dismissal of a frivolous lawsuit pursuant to Section 3–6–3(d) of this Code in which the Department seeks to revoke up to 180 days of good conduct credit, and if the prisoner has not accumulated 180 days of good conduct credit at the time of the dismissal, then all good conduct credit accumulated by the prisoner shall be revoked.

(a–5) The Prisoner Review Board, with the cooperation of and in coordination with the Department of Corrections and the Department of Central Management Services, shall implement a pilot project in 3 correctional institutions providing for the conduct of hearings under paragraphs (1) and (4) of subsection (a) of this Section through interactive video conferences. The project shall be implemented within 6 months after the effective date of this amendatory Act of 1996. Within 6 months after the implementation of the pilot project, the Prisoner Review Board, with the cooperation of and in coordination with the Department of Corrections and the Department of Central Management Services, shall report to the Governor and the General Assembly regarding the use, costs, effectiveness, and future viability of interactive video conferences for Prisoner Review Board hearings.

(b) Upon recommendation of the Department the Board may restore good conduct credit previously revoked.

(c) The Board shall cooperate with the Department in promoting an effective system of parole and mandatory supervised release.

(d) The Board shall promulgate rules for the conduct of its work, and the Chairman shall file a copy of such rules and any amendments thereto with the Director and with the Secretary of State.

(e) The Board shall keep records of all of its official actions and shall make them accessible in accordance with law and the rules of the Board.

(f) The Board or one who has allegedly violated the conditions of his parole or mandatory supervised release may require by subpoena the attendance and testimony of witnesses and the production of documentary evidence relating to any matter under investigation or hearing. The Chairman of the Board may sign subpoenas which shall be served by any agent or public official authorized by the Chairman of the Board, or by any person lawfully authorized to serve a subpoena under the laws of the State of Illinois. The attendance of witnesses, and the production of documentary evidence, may be required from any place in the State to a hearing location in the State before the Chairman of the Board or his designated agent or agents or any duly constituted Committee or Subcommittee of the Board. Witnesses so summoned shall be paid the same fees and mileage that are paid witnesses in the circuit courts of the State, and

witnesses whose depositions are taken and the persons taking those depositions are each entitled to the same fees as are paid for like services in actions in the circuit courts of the State. Fees and mileage shall be vouchered for payment when the witness is discharged from further attendance.

In case of disobedience to a subpoena, the Board may petition any circuit court of the State for an order requiring the attendance and testimony of witnesses or the production of documentary evidence or both. A copy of such petition shall be served by personal service or by registered or certified mail upon the person who has failed to obey the subpoena, and such person shall be advised in writing that a hearing upon the petition will be requested in a court room to be designated in such notice before the judge hearing motions or extraordinary remedies at a specified time, on a specified date, not less than 10 nor more than 15 days after the deposit of the copy of the written notice and petition in the U.S. mails addressed to the person at his last known address or after the personal service of the copy of the notice and petition upon such person. The court upon the filing of such a petition, may order the person refusing to obey the subpoena to appear at an investigation or hearing, or to there produce documentary evidence, if so ordered, or to give evidence relative to the subject matter of that investigation or hearing. Any failure to obey such order of the circuit court may be punished by that court as a contempt of court.

Each member of the Board and any hearing officer designated by the Board shall have the power to administer oaths and to take the testimony of persons under oath.

(g) Except under subsection (a) of this Section, a majority of the members than appointed to the Prisoner Review Board shall constitute a quorum for the transaction of all business of the Board.

(h) The Prisoner Review Board shall annually transmit to the Director a detailed report of its work for the preceding calendar year. The annual report shall also be transmitted to the Governor for submission to the Legislature.

P.A. 77–2097, § 3–3–2, eff. Jan. 1, 1973. Amended by P.A. 77–2827, § 1, eff. Jan. 1, 1973; P.A. 78–255, § 61, eff. Oct. 1, 1973; P.A. 80–1099, § 3, eff. Feb. 1, 1978; P.A. 80–1387, § 3, eff. Aug. 18, 1978; P.A. 82–717, § 2, eff. July 1, 1982; P.A. 83–1433, § 1, eff. Jan. 1, 1985; P.A. 83–1449, § 1, eff. Sept. 17, 1984; P.A. 84–1301, § 1, eff. Aug. 19, 1986; P.A. 84–1450, § 4, eff. July 1, 1987; P.A. 85–293, Art. II, § 8, eff. Sept. 8, 1987; P.A. 87–224, § 105, eff. Jan. 1, 1992; P.A. 89–490, § 5, eff. Jan. 1, 1997; P.A. 89–656, § 15, eff. Jan. 1, 1997.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 1003–3–2.

1 730 ILCS 105/1 et seq.

For application of P.A. 84–1450, see Historical Note following ch. 37, ¶ 702–7 (now repealed).

P.A. 89–490, in subsec. (a), pars. (1), (2), (3), (5) and (6), inserted "hear by at least one member and"; in par. (1), substituted "members decide, cases" for "members, hear cases"; in pars. (2) and (3), substituted "members decide, the conditions" for "members, determine the conditions"; in par. (5), substituted "members decide, the release" for "members, by majority vote set the release"; in par. (6), substituted "members decide, all requests" for "members, hear all requests"; and inserted subsec. (a–5).

P.A. 89–656, in subsec. (a), added par. (8).

See 5 ILCS 70/6 as to the effect of (1) more than one amendment of a section at the same session of the General Assembly or (2) two or more acts relating to the same subject matter enacted by the same General Assembly.

### 5/3–3–2.1.  Prisoner Review Board—Release date

§ 3–3–2.1.  Prisoner Review Board—Release Date.  (a) Except as provided in subsection (b), the Prisoner Review



**5/3–6–3.  Rules and regulations for early release**

§ 3–6–3.  Rules and Regulations for Early Release.

(a)(1) The Department of Corrections shall prescribe rules and regulations for the early release on account of good conduct of persons committed to the Department which shall be subject to review by the Prisoner Review Board.

(2) The rules and regulations on early release shall provide, with respect to offenses committed on or after the effective date of this amendatory Act of 1995, the following:

(i) that a prisoner who is serving a term of imprisonment for first degree murder shall receive no good conduct credit and shall serve the entire sentence imposed by the court;

(ii) that a prisoner serving a sentence for attempt to commit first degree murder, solicitation of murder, solicitation of murder for hire, intentional homicide of an unborn child, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, aggravated battery with a firearm, heinous battery, aggravated battery of a senior citizen, or aggravated battery of a child shall receive no more than 4.5 days of good conduct credit for each month of his or her sentence of imprisonment; and

(iii) that a prisoner serving a sentence for home invasion, armed robbery, aggravated vehicular hijacking, aggravated discharge of a firearm, or armed violence with a category I weapon or category II weapon, when the court has made and entered a finding, pursuant to subsection (c–1) of Section 5–4–1 of this Code, that the conduct leading to conviction for the enumerated offense resulted in great bodily harm to a victim, shall receive no more than 4.5 days of good conduct credit for each month of his or her sentence of imprisonment.

(2.1) For all offenses, other than those enumerated in subdivision (a)(2) committed on or after the effective date of this amendatory Act of 1995, the rules and regulations shall provide that a prisoner who is serving a term of imprisonment shall receive one day of good conduct credit for each day of his or her sentence of imprisonment or recommitment under Section 3–3–9.  Each day of good conduct credit shall reduce by one day the prisoner's period of imprisonment or recommitment under Section 3–3–9.

(2.2) A prisoner serving a term of natural life imprisonment or a prisoner who has been sentenced to death shall receive no good conduct credit.

(3) The rules and regulations shall also provide that the Director may award up to 180 days additional good conduct credit for meritorious service in specific instances as the Director deems proper; except that no more than 90 days of good conduct credit for meritorious service shall be awarded to any prisoner who is serving a sentence for conviction of first degree murder, reckless homicide while under the influence of alcohol or any other drug, aggravated kidnapping, kidnapping, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, deviate sexual assault, aggravated criminal sexual abuse, aggravated indecent liberties with a child, indecent liberties with a child, child pornography, heinous battery, aggravated battery of a spouse, aggravated battery of a spouse with a firearm, stalking, aggravated stalking, aggravated battery of a child, endangering the life or health of a child, cruelty to a child, or narcotic racketeering.  Notwithstanding the foregoing, good conduct credit for meritorious service shall not be awarded on a sentence of imprisonment imposed for conviction of one of the offenses enumerated in subdivision (a)(2) when the offense is committed on or after the effective date of this amendatory Act of 1995.

(4) The rules and regulations shall also provide that the good conduct credit accumulated and retained under paragraph (2.1) of subsection (a) of this Section by any inmate during specific periods of time in which such inmate is engaged full-time in substance abuse programs, correctional industry assignments, or educational programs provided by the Department under this paragraph (4) and satisfactorily completes the assigned program as determined by the standards of the Department, shall be multiplied by a factor of 1.25 for program participation before the effective date of this amendatory Act of 1993 and 1.50 for program participation on or after that date.  However, no inmate shall be eligible for the additional good conduct credit under this paragraph (4) while assigned to a boot camp, mental health unit, or electronic detention, or if convicted of an offense enumerated in paragraph (a)(2) of this Section that is committed on or after the effective date of this amendatory Act of 1995, or first degree murder, a Class X felony, criminal sexual assault, felony criminal sexual abuse, aggravated criminal sexual abuse, aggravated battery with a firearm, or any predecessor or successor offenses with the same or substantially the same elements, or any inchoate offenses relating to the foregoing offenses.  No inmate shall be eligible for the additional good conduct credit under this paragraph (4) who (i) has previously received increased good conduct credit under this paragraph (4) and has subsequently been convicted of a felony, or (ii) has previously served more than one prior sentence of imprisonment for a felony in an adult correctional facility.

Educational, vocational, substance abuse and correctional industry programs under which good conduct credit may be increased under this paragraph (4) shall be evaluated by the Department on the basis of documented standards.  The Department shall report the results of these evaluations to the Governor and the General Assembly by September 30th of each year.  The reports shall include data relating to the recidivism rate among program participants.

Availability of these programs shall be subject to the limits of fiscal resources appropriated by the General Assembly for these purposes.  Eligible inmates who are denied immediate admission shall be placed on a waiting list under criteria established by the Department.  The inability of any inmate to become engaged in any such programs by reason of insufficient program resources or for any other reason established under the rules and regulations of the Department shall not be deemed a cause of action under which the Department or any employee or agent of the Department shall be liable for damages to the inmate.

(5) Whenever the Department is to release any inmate earlier than it otherwise would because of a grant of good conduct credit for meritorious service given at any time during the term, the Department shall give reasonable advance notice of the impending release to the State's Attorney of the county where the prosecution of the inmate took place.

(b) Whenever a person is or has been committed under several convictions, with separate sentences, the sentences shall be construed under Section 5–8–4 in granting and forfeiting of good time.

EXHIBIT B

(c) The Department shall prescribe rules and regulations for revoking good conduct credit, or suspending or reducing the rate of accumulation of good conduct credit for specific rule violations, during imprisonment. These rules and regulations shall provide that no inmate may be penalized more than one year of good conduct credit for any one infraction.

When the Department seeks to revoke, suspend or reduce the rate of accumulation of any good conduct credits for an alleged infraction of its rules, it shall bring charges therefor against the prisoner sought to be so deprived of good conduct credits before the Prisoner Review Board as provided in subparagraph (a)(4) of Section 3–3–2 of this Code, if the amount of credit at issue exceeds 30 days or when during any 12 month period, the cumulative amount of credit revoked exceeds 30 days except where the infraction is committed or discovered within 60 days of scheduled release. In those cases, the Department of Corrections may revoke up to 30 days of good conduct credit. The Board may subsequently approve the revocation of additional good conduct credit, if the Department seeks to revoke good conduct credit in excess of 30 days. However, the Board shall not be empowered to review the Department's decision with respect to the loss of 30 days of good conduct credit within any calendar year for any prisoner or to increase any penalty beyond the length requested by the Department.

The Director of the Department of Corrections, in appropriate cases, may restore up to 30 days good conduct credits which have been revoked, suspended or reduced. Any restoration of good conduct credits in excess of 30 days shall be subject to review by the Prisoner Review Board. However, the Board may not restore good conduct credit in excess of the amount requested by the Director.

Nothing contained in this Section shall prohibit the Prisoner Review Board from ordering, pursuant to Section 3–3–9(a)(3)(i)(B), that a prisoner serve up to one year of the sentence imposed by the court that was not served due to the accumulation of good conduct credit.

(d) If a lawsuit is filed by a prisoner in an Illinois or federal court against the State, the Department of Corrections, or the Prisoner Review Board, or against any of their officers or employees, and the court makes a specific finding that a pleading, motion, or other paper filed by the prisoner is frivolous, the Department of Corrections shall conduct a hearing to revoke up to 180 days of good conduct credit by bringing charges against the prisoner sought to be deprived of the good conduct credits before the Prisoner Review Board as provided in subparagraph (a)(8) of Section 3–3–2 of this Code. If the prisoner has not accumulated 180 days of good conduct credit at the time of the finding, then the Prisoner Review Board may revoke all good conduct credit accumulated by the prisoner.

For purposes of this subsection (d):

(1) "Frivolous" means that a pleading, motion, or other paper filed by a prisoner in his or her lawsuit does not meet the following criteria:

(A) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(B) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(C) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(D) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(2) "Lawsuit" means a petition for post conviction relief under Article 122 of the Code of Criminal Procedure of 1963,[1] a habeas corpus action under Article X of the Code of Civil Procedure [2] or under federal law (28 U.S.C. 2254), a petition for claim under the Court of Claims Act or an action under the federal Civil Rights Act (42 U.S.C. 1983).

P.A. 77–2097, § 3–6–3, eff. Jan. 1, 1973. Amended by P.A. 79–799, § 1, eff. Oct. 1, 1975; P.A. 80–1099, § 3, eff. Feb. 1, 1978; P.A. 82–717, § 2, eff. July 1, 1982; P.A. 83–621, § 1, eff. Sept. 19, 1983; P.A. 83–1073, § 26, eff. July 1, 1984; P.A. 83–1362, Art. II, § 48, eff. Sept. 11, 1984; P.A. 86–1090, § 1, eff. July 13, 1990; P.A. 86–1373, § 1, eff. Sept. 10, 1990; P.A. 87–435, Art. 2, § 2–10, eff. Sept. 10, 1991; P.A. 88–311, § 15, eff. Aug. 11, 1993; P.A. 88–402, § 10, eff. Aug. 20, 1993; P.A. 88–670, Art. 2, § 2–66, eff. Dec. 2, 1994; P.A. 89–404, § 40, eff. Aug. 20, 1995; P.A. 89–428, Art. 2, § 280, eff. Dec. 13, 1995; P.A. 89–462, Art. 2, § 280, eff. May 29, 1996; P.A. 89–656, § 15, eff. Jan. 1, 1997.

Formerly Ill.Rev.Stat.1991, ch. 38, ¶ 1003–6–3.

[1] 725 ILCS 5/122–1 et seq.

[2] 735 ILCS 5/10–101 et seq.

P.A. 89–656 incorporated the amendments by P.A. 89–404, P.A. 89–428 and P.A. 89–462.

## 5/3–6–3.1. Truth-in-Sentencing Commission

§ 3–6–3.1.  Truth-in-Sentencing Commission.

(a) Legislative findings. The General Assembly finds that violent crime continues to be a severe problem in Illinois. Criminals sentenced to prison for violating the laws of Illinois are often released after serving a fraction of their sentence under Illinois' early release statute. The early release of criminals from prison after they are sentenced to longer terms in court misleads the public as well as victims of crime. Many of these criminals return to a life of crime immediately upon their early release from prison, committing violent acts including murder and rape. Public safety, as well as the integrity of the justice system, demands that criminals serve the sentences handed down by the courts, and that a Truth-in-Sentencing Commission be established to effectuate this goal.

(b) Truth-in-Sentencing Commission. There is created the Illinois Truth-in-Sentencing Commission, to consist of 13 members as follows:

(1) Three members appointed by the Governor, one of whom shall be a member of the faculty of an accredited Illinois law school;

(2) The Attorney General or his or her designee;

(3) One member appointed by the President of the Senate;

(4) One member appointed by the Minority Leader of the Senate;

(5) One member appointed by the Speaker of the House of Representatives;

(6) One member appointed by the Minority Leader of the House of Representatives;

(7) The Director of the Illinois Department of Corrections or his or her designee;

(8) The State's Attorney of Cook County or his or her designee;

(9) The Executive Director of the Illinois Criminal Justice Information Authority or his or her designee;



EXHIBIT B

**730 ILCS 5/3–6–3**

## CORRECTIONS

554

offenses with the same or substantially the same elements, or any inchoate offenses relating to the foregoing offenses. No inmate shall be eligible for the additional good conduct credit under this paragraph (4) who (i) has previously received increased good conduct credit under this paragraph (4) and has subsequently been convicted of a felony, or (ii) has previously served more than one prior sentence of imprisonment for a felony in an adult correctional facility.

Educational, vocational, substance abuse and correctional industry programs under which good conduct credit may be increased under this paragraph (4) shall be evaluated by the Department on the basis of documented standards. The Department shall report the results of these evaluations to the Governor and the General Assembly by September 30th of each year. The reports shall include data relating to the recidivism rate among program participants.

Availability of these programs shall be subject to the limits of fiscal resources appropriated by the General Assembly for these purposes. Eligible inmates who are denied immediate admission shall be placed on a waiting list under criteria established by the Department. The inability of any inmate to become engaged in any such programs by reason of insufficient program resources or for any other reason established under the rules and regulations of the Department shall not be deemed a cause of action under which the Department or any employee or agent of the Department shall be liable for damages to the inmate.

(5) Whenever the Department is to release any inmate earlier than it otherwise would because of a grant of good conduct credit for meritorious service given at any time during the term, the Department shall give reasonable advance notice of the impending release to the State's Attorney of the county where the prosecution of the inmate took place.

(b) Whenever a person is or has been committed under several convictions, with separate sentences, the sentences shall be construed under Section 5–8–4 in granting and forfeiting of good time.

(c) The Department shall prescribe rules and regulations for revoking good conduct credit, or suspending or reducing the rate of accumulation of good conduct credit for specific rule violations, during imprisonment. These rules and regulations shall provide that no inmate may be penalized more than one year of good conduct credit for any one infraction.

When the Department seeks to revoke, suspend or reduce the rate of accumulation of any good conduct credits for an alleged infraction of its rules, it shall bring charges therefor against the prisoner sought to be so deprived of good conduct credits before the Prisoner Review Board as provided in subparagraph (a)(4) of Section 3–3–2 of this Code, if the amount of credit at issue exceeds 30 days or when during any 12 month period, the cumulative amount of credit revoked exceeds 30 days except where the infraction is committed or discovered within 60 days of scheduled release. In those cases, the Department of Corrections may revoke up to 30 days of good conduct credit. The Board may subsequently approve the revocation of additional good conduct credit, if the Department seeks to revoke good conduct credit in excess of 30 days. However, the Board shall not be empowered to review the Department's decision with respect to the loss of 30 days of good conduct credit within any calendar year for any prisoner or to increase any penalty beyond the length requested by the Department.

The Director of the Department of Corrections, in appropriate cases, may restore up to 30 days good conduct credits which have been revoked, suspended or reduced. Any restoration of good conduct credits in excess of 30 days shall be subject to review by the Prisoner Review Board. However, the Board may not restore good conduct credit in excess of the amount requested by the Director.

Nothing contained in this Section shall prohibit the Prisoner Review Board from ordering, pursuant to Section 3–3–9(a)(3)(i)(B), that a prisoner serve up to one year of the sentence imposed by the court that was not served due to the accumulation of good conduct credit.

(d) If a lawsuit is filed by a prisoner in an Illinois or federal court against the State, the Department of Corrections, or the Prisoner Review Board, or against any of their officers or employees, and the court makes a specific finding that a pleading, motion, or other paper filed by the prisoner is frivolous, the Department of Corrections shall conduct a hearing to revoke up to 180 days of good conduct credit by bringing charges against the prisoner sought to be deprived of the good conduct credits before the Prisoner Review Board as provided in subparagraph (a)(8) of Section 3–3–2 of this Code. If the prisoner has not accumulated 180 days of good conduct credit at the time of the finding, then the Prisoner Review Board may revoke all good conduct credit accumulated by the prisoner.

For purposes of this subsection (d):

(1) "Frivolous" means that a pleading, motion, or other filing which purports to be a legal document filed by a prisoner in his or her lawsuit meets any or all of the following criteria:

(A) it lacks an arguable basis either in law or in fact;

(B) it is being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(C) the claims, defenses, and other legal contentions therein are not warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(D) the allegations and other factual contentions do not have evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; or

(E) the denials of factual contentions are not warranted on the evidence, or if specifically so identified, are not reasonably based on a lack of information or belief.

(2) "Lawsuit" means a petition for post conviction relief under Article 122 of the Code of Criminal Procedure of 1963,[1] a motion pursuant to Section 116–3 of the Code of Criminal Procedure of 1963,[2] a habeas corpus action under Article X of the Code of Civil Procedure[3] or under federal law (28 U.S.C. 2254), a petition for claim under the Court of Claims Act[4] or an action under the federal Civil Rights Act (42 U.S.C. 1983).

P.A. 77–2097, § 3–6–3, eff. Jan. 1, 1973. Amended by P.A. 79–799, § 1, eff. Oct. 1, 1975; P.A. 80–1099, § 3, eff. Feb. 1, 1978; P.A. 82–717, § 2, eff. July 1, 1982; P.A. 83–621, § 1, eff. Sept. 19, 1983; P.A. 83–1073, § 26, eff. July 1, 1984; P.A. 83–1362, Art. II, § 48, eff. Sept. 11, 1984; P.A. 86–1090, § 1, eff. July 13, 1990; P.A. 86–1373, § 1, eff. Sept. 10, 1990; P.A. 87–435, Art. 2, § 2–10, eff. Sept. 10, 1991; P.A. 88–311, § 15, eff. Aug. 11, 1993; P.A. 88–402, § 10, eff. Aug. 20, 1993; P.A. 88–670, Art. 2, § 2–66, eff. Dec. 2, 1994; P.A. 89–404, § 40, eff. Aug. 20, 1995; P.A. 89–428, Art. 2, § 280, eff. Dec. 13,

EXHIBIT C

1995; P.A. 89–462, Art. 2, § 280, eff. May 29, 1996; P.A. 89–656, § 15, eff. Jan. 1, 1997; P.A. 90–141, § 7, eff. Jan. 1, 1998; P.A. 90–505, § 20, eff. Aug. 19, 1997.

**Formerly** Ill.Rev.Stat.1991, ch. 38, ¶ 1003–6–3.

[1] 725 ILCS 5/122–1 et seq.

[2] 725 ILCS 5/116–3.

[3] 735 ILCS 5/10–101 et seq.

[4] 705 ILCS 505/1 et seq.

**Validity**

*Provisions added by P.A. 88–311 to this section have been held unconstitutional by the Illinois Supreme Court in the case of Barger v. Peters, 163 Ill.2d 357, 645 N.E.2d 175, 206 Ill.Dec. 170 (1994).*

P.A. 89–428 was held by the Illinois Supreme Court to be in violation of the single subject requirement of subsection (d) of Section 8 of Article IV of the Illinois Constitution in the case of Johnson v. Edgar, 1997, 176 Ill.2d 499, 680 N.E.2d 1372, 224 Ill.Dec. I. Public Act 89–462 reenacted the amendment of this text by P.A. 89–428.

P.A. 90–141, in subsec. (d), in par. (2), inserted "a motion pursuant to Section 116–3 of the Code of Criminal Procedure of 1963,".

P.A. 90–505, in subsec. (d), rewrote par. (1), which prior thereto read:

"(1) 'Frivolous' means that a pleading, motion, or other paper filed by a prisoner in his or her lawsuit does not meet the following criteria:

"(A) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

"(B) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

"(C) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

"(D) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief."

See 5 ILCS 70/6 as to the effect of (1) more than one amendment of a section at the same session of the General Assembly or (2) two or more acts relating to the same subject matter enacted by the same General Assembly.

**5/3–6–3.1.  Truth-in-Sentencing Commission**

§ 3–6–3.1.  Truth-in-Sentencing Commission.

(a)  Legislative findings.  The General Assembly finds that violent crime continues to be a severe problem in Illinois. Criminals sentenced to prison for violating the laws of Illinois are often released after serving a fraction of their sentence under Illinois' early release statute.  The early release of criminals from prison after they are sentenced to longer terms in court misleads the public as well as victims of crime. Many of these criminals return to a life of crime immediately upon their early release from prison, committing violent acts including murder and rape.  Public safety, as well as the integrity of the justice system, demands that criminals serve the sentences handed down by the courts, and that a Truth-in-Sentencing Commission be established to effectuate this goal.

(b)  Truth-in-Sentencing Commission.  There is created the Illinois Truth-in-Sentencing Commission, to consist of 13 members as follows:

(1)  Three members appointed by the Governor, one of whom shall be a member of the faculty of an accredited Illinois law school;

(2)  The Attorney General or his or her designee;

(3)  One member appointed by the President of the Senate;

(4)  One member appointed by the Minority Leader of the Senate;

(5)  One member appointed by the Speaker of the House of Representatives;

(6)  One member appointed by the Minority Leader of the House of Representatives;

(7)  The Director of the Illinois Department of Corrections or his or her designee;

(8)  The State's Attorney of Cook County or his or her designee;

(9)  The Executive Director of the Illinois Criminal Justice Information Authority or his or her designee;

(10)  The President of the Illinois State's Attorneys Association; and

(11)  The President of the Illinois Association of Chiefs of Police.

All appointments shall be filed with the Secretary of State by the appointing authority.

(c)  Duties of the Commission.  This Commission shall:

(1)  develop and monitor legislation facilitating the implementation of Truth-in-Sentencing laws which require criminals to serve at least 85% of their court-imposed sentences, using any information and recommendations available regarding those laws;

(2)  review the funding provisions of the Violent Crime Control Act of 1994,[1] and any subsequent federal legislation of a comparable nature, to comment in appropriate federal rulemaking and legislative processes on State law enforcement, correctional, and fiscal concerns, and, upon the finalization of federal requirements, to determine what is required to obtain maximum federal funding to assist the State in implementing Truth-in-Sentencing laws; and

(3)  study the possibility of changing sentences in order to more accurately reflect the actual time spent in prison, while preserving the system's ability to punish criminals justly and equitably.

(d)  Organization.  The Commission shall elect a Chair and Vice-Chair from among its members at its first meeting. The members of the Commission shall serve without compensation but shall be reimbursed for reasonable expenses incurred in the course of performing their duties.

(e)  Intergovernmental cooperation.  The Illinois Criminal Justice Information Authority shall assist the Commission with any and all research and drafting necessary to fulfill its duties.  The Illinois Department of Corrections shall give any reasonable assistance to the Commission, including making available all pertinent statistical information at the Department's disposal.

(f)  The Commission shall present a full report and a draft of appropriate Truth-in-Sentencing legislation to the Governor and the General Assembly no later than March 1, 1997.

P.A. 77–2097, § 3–6–3.1, added by P.A. 89–404, § 40, eff. Aug. 20, 1995.  Amended by P.A. 89–428, Art. 6, § 610, eff. Dec. 13, 1995.  Reenacted and amended by P.A. 89–689, § 130, eff. Dec. 31, 1996.

[1] 42 U.S.C.A. § 13701 et seq.

The amendments by P.A. 89–428 and P.A. 89–689 were identical.

P.A. 89–428 was held by the Illinois Supreme Court to be in violation of the single subject requirement of subsection (d) of Section 8 of Article IV of the Illinois Constitution in the case of Johnson v.

**EXHIBIT  C**

MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS

**Ground one:**  ILLINOIS' STATUTORY SCHEME AT 730 ILCS 5/3-6-3(d) and 730 ILCS 5/3-3-2(a)(8)—THE STATUTORY SCHEME PURSUANT TO WHICH PETITIONER WAS CONVICTED—IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

As a preliminary matter, it should be noted that "'although a duly enacted statute normally carries with it a presumption of constitutionality, when a [statute] allegedly infringes on the exercise of [F]irst [A]mendment rights, **the statute's PROPONENT bears the burden of establishing [its] constitutionality.'"** Forum for Academic v. Rumsfeld, 390 F.3d 219, 229 n. 8 (3rd Cir. 2004) (quoting ACORN v. City of Frontenac, 714 F.2d 813, 817 (8th Cir. 1983); emphasis added). Accord Heffron v. Int'l Soc. for Krishna Consc., 452 U.S. 640, 658 (1981). See also Citizens, etc. v. Village of Schaumburg, 590 F.2d 220, 224 (7th Cir. 1978) (holding identical to Forum for Academic and citing Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971)). Since the statutory scheme at issue in this case infringes on the exercise of First Amendment rights, the State bears the burden of establishing its constitutionality.

### The Statutory Scheme is Unconstitutionally Vague & Overbroad

As a result of being both unconstitutionally vague and overbroad, the statutory scheme found at 730 ILCS 5/3-6-3(d) and 730 ILCS 5/3-3-2(a)(8) violates prisoner litigants' right to due process and abridges—if not vitiates—their right of access to the courts. This statutory scheme is both unconstitutionally vague and overbroad in that it is written in language that the average prisoner litigant cannot possibly understand, lacks an mens rea or notice requirement, contains insufficiently clear standards for those who enforce it, and is written so broadly that it infringes on constitutionally protected rights. Faced with the prospect of extending their prison stay, and unable to conform their conduct to the requirements of statutes they cannot possibly understand, prisoners will be forced to abandon their right of access to the courts altogether.

In Grayned v. City of Rockford, 408 U.S. 104, 108-109 (1972), the Supreme Court held:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the **PERSON OF ORDINARY INTELLIGENCE** a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide **EXPLICIT STANDARDS**

for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and **subjective basis**, with the attendant dangers of **ARBITRARY AND DISCRIMINA-TORY APPLICATION.**  Third, but related, where a vague statute "abut(s) upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of (those) freedoms."  Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked."  [Emphasis added.]

Accord <u>United States v. O'Hara</u>, 301 F.3d 563, 570 (7th Cir. 2002).  Similarly,

in <u>United States v. Lanier</u>, 520 U.S. 259, 265–266 (1997), the Supreme Court

held that statutes must provide:

"**fair warning . . . in language that the COMMON WORLD will understand**, of what the law intends to do if a certain line is passed.  To make the warning fair, so far as possible the line should be clear."  <u>McBoyle v. United States</u>, 283 U.S. 25, 27 . . . (1931).  "'The . . . principle is that **no man** shall be held **criminally responsible** for conduct which he could not **REASONABLY understand** to be proscribed.'"  <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 351 . . . (1964) (quoting <u>United States v. Harriss</u>, 347 U.S. 612, 617 . . . (1954)).  * * * . . .  the vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act **in terms so vague that MEN OF COMMON INTELLIGENCE** must necessarily guess at its meaning and differ as to its application."  <u>Connally v. General Constr. Co.</u>, 269 U.S. 385, 391 . . . (1926); accord, <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 . . . (1983); <u>Lanzetta v. New Jersey</u>, 306 U.S. 451, 453 . . . (1939).  [Emphasis added.]

Accord <u>U.S. v. Balint</u>, 201 F.3d 928, 934 (7th Cir. 2000).

The vagueness doctrine espoused in <u>Grayned</u> has been applied both to prison

rules and to penal statutes.  In <u>Laaman v. Helgemoe</u>, 437 F.Supp. 269, 321–322

(D.N.H. 1977), the Court held that:

A rule or regulation, the violation of which can result in disciplinary proceedings must apprise inmates of the proscribed conduct.  The usual rule is that a statute or regulation must "give a person of **ORDINARY INTELLIGENCE FAIR NOTICE** that his contemplated conduct is forbidden.  The underlying principle is that no man shall be held criminally responsible for conduct which he could not **REASONABLY understand** to be proscribed."  <u>United States v. Harriss</u>, 347 U.S. 612, 617 . . . (1954).  [Emphasis added.]

Accord <u>Rios v. Lane</u>, 812 F.2d 1032 (7th Cir. 1987) (citing <u>Grayned</u>).

The statutory scheme at issue in this case is directed exclusively at pris-

oners.  As a result, in order to withstand a challenge that it is unconstitutionally

vague, it must be written in language that the ordinary prisoner can understand.

As noted on page 9 of the Petition, however, nearly 96% of IDOC inmates read at

or below the 8th grade level.  The statistics cited in the Petition are drawn

from <u>Walters v. Edgar</u>, 900 F.Supp. 197, 203 (N.D.Ill. 1995) and from statements

made by IDOC spokesman Brian Fairchild in an interview with the Chicago Tribune,

as reported on page 1 of the December 16, 2001 edition.  As Dr. Joanne Carlisle

testified in <u>Walters</u>, 900 F.Supp. at 205, however, the various types of legal

material "that inmates would typically use in attempting to access the courts" require "**AT LEAST AN ELEVENTH GRADE READING ABILITY . . . .**" (Emphasis added.) While Dr. Carlisle did not analyze the statute at issue, her analysis included a comprehensive cross-section of various statutes and other legal materials one finds in a law library. Since (as noted on page 8 of the Petition) the defini-tion of "frivolous" found in Section 3-6-3(d)(1) is drawn verbatim from Rule 11 of the Federal Rules of Civil Procedure (a rule written by, and designed pri-marily for, licensed attorneys authorized to practice law in Federal District Courts) it is fair and reasonable to conclude that Dr. Carlisle's readability finding can be extended to the statute at issue as well. In other words, in order to understand 730 ILCS 5/3-6-3(d), an inmate would have to possess "**AT LEAST AN ELEVENTH GRADE READING ABILITY.**" Walters, 900 F.Supp. at 205 (emphasis added). Frankly, Petitioner respectfully submits that understanding this statute requires **AT LEAST A POST-COLLEGE GRADUATE LEVEL READING ABILITY**, given the fact that the college educated PRB members who addressed this issue felt it necessary to refer the matter to an attorney--and **EVEN HE GOT IT WRONG!** (See Petition, pages 10-12.)

When one considers Dr. Carlisle's testimony regarding the readability of legal materials--including various Illinois statutes--together with the findings regarding the reading ability of IDOC inmates, it is clear that the statute at issue in this case is incomprehensible to **AT LEAST 95.7% of IDOC inmates,** who are the people within the scope of responsibility for compliance! Applying the Supreme Court's holdings in Grayned, Lanier and the cases cited therein to these facts lead one to the ineluctable conclusion that the statute at issue is uncon-stitutionally vague because it does **NOT** provide fair warning in language that the average prison inmate can understand. The statute is written in language incomprehensible to the overwhelming majority of IDOC inmates, sets pleading standards they cannot possibly meet, and imposes punishment when they fail to meet those standards.

Even when the prisoner manages to meet these heightened pleading standards, he faces the very real risk that his Good Conduct Credits will be revoked on the basis of an erroneous finding of frivolity by the court, as happened in Petitioner's case. Even if the erroneous frivolity finding is later reversed, this statutory scheme makes no provision for revisiting this issue and restoring the prisoner's Good Conduct Credits, which impacts his right to procedural and substantive due process. Under these circumstances, the only sure way for an inmate to avoid violating the statutory scheme and lose his Good Conduct Credits

is to abandon altogether his right to meaningful access to the courts!  There-
fore, this statutory scheme has the practical effect of depriving many--if not
most--prisoners of their right to meaningful access to the courts.

Another sign that this statutory scheme is unconstitutionally vague is the
fact that it contains no mens rea or notice requirement.  As noted on page 8 of
the Petition, the definitions of "frivolous" found in Section 3-6-3(d)(1)(B)-(E)
are borrowed essentially verbatim from Rule 11(b)(1)-(4) of the Federal Rules
of Civil Procedure.  (The definition found in Section 3-6-3(d)(1)(A) is redun-
dant, since a pleading that "lacks an arguable basis either in law or in fact"
would also meet the other criteria for frivolity set forth in subparagraphs (B)-
(E).)  Rule 11, however, contains a mens rea or notice requirement (a.k.a. the
"safe harbor" provision), which is conspicuously absent from Section 3-6-3(d).
Moreover, Rule 11(c) authorizes only **CIVIL** penalties for litigants who violate
Rule 11(b)!

In Lambert v. California, 355 U.S. 225, 228 (1957), the Supreme Court held
that:  "Engrained in our concept of due process is the requirement of notice."
The Court held further that the lack of any mens rea requirement in a statute
can constitute a lack of notice, which renders the statute unconstitutional in
that it violates the due process rights of the citizens to whom it is applied.

In United States v. United States Gypsum Co., 438 U.S. 422, 436 (1978), the
Supreme Court observed that:  "'The existence of a mens rea is the rule of,
rather than the exception to, the principles of Anglo-American criminal juris-
prudence.'"  (quoting Dennis v. United States, 341 U.S. 494, 500 (1951)).
Accord Staples v. United States, 511 U.S. 600, 605-606 (1994) (holding that
"offenses that require no mens rea generally are disfavored.").

In this case, as in Lambert and Staples, the statutory scheme is silent
regarding mens rea; however, given Judge Baker's finding that "[t]he court does
not doubt that the plaintiff believed he had grounds for his motion," (C-511)
the only way the IDOC and PRB could find Petitioner guilty of violating Section
3-6-3(d) is by interpreting it as lacking a mens rea requirement.  Therefore,
given the authority cited supra, the statutory scheme at issue is unconstitu-
tionally vague because it fails "to provide adequate notice because it contains
no mens rea requirement or any other criminal element."  Lytle v. Doyle, 197
F.Supp.2d 481, 489 (E.D.Va. 2001).

As noted above, Rule 11(c) authorizes only **CIVIL** penalties for litigants
who violate Rule 11(b), the federal counterpart to Section 3-6-3(d).  In Chatin
v. Coombe, 186 F.3d 82, 86 (2nd Cir. 1999), the Court held that:

The degree of statutory vagueness that the Due Process Clause will tolerate "depends in part on the nature of the enactment at issue." Hoffman Estates v. Flipside, 455 U.S. 489, 498 . . . (1982). There is GREATER TOLERANCE FOR "enactments with CIVIL rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Id. at 499 . . . . Vagueness is particularly problematic when it "abuts upon sensitive areas of basic First Amendment freedoms." Grayned , , , 408 U.S. 104, 109 . . . . [Emphasis added.]

Since Section 3-6-3(d) imposes CRIMINAL penalties (as opposed to the CIVIL penalties imposed by its federal counterpart, Rule 11), under Chatin and the cases cited therein, there must be LESS TOLERANCE for the degree of statutory vagueness found therein, particularly in light of the absence of a mens rea requirement! As the Court held in Karlin v. Foust, 188 F.3d 446, 458 (7th Cir. 1999), "[w]hen a law threatens to inhibit the exercise of constitutionally protected rights . . . the Constitution demands that courts apply a more stringent vagueness test." The statutory scheme at issue in this case clearly fails such a test.

It is by now axiomatic that "filing a complaint in court is a form of petitioning activity" protected by the First Amendment. McDonald v. Smith, 472 U.S. 479, 484 (1985). In United Mine Workers v. Illinois Bar Association, 389 U.S. 217, 222 (1967), the Supreme Court held that:

the rights to assemble peaceably and TO PETITION for a redress of grievances are among the most precious of the liberties safeguarded by the Bill of Rights. THESE RIGHTS, moreover, ARE INTIMATELY CONNECTED, both in origin and in purpose, WITH THE OTHER FIRST AMENDMENT RIGHTS of free speech and free press. "All these, though not identical, are inseparable." Thomas v. Collins, 323 U.S. 516, 530 . . . (1945) [other citation omitted]. The First Amendment would, however, be a hollow promise if it left government free TO DESTROY OR ERODE ITS GUARANTEES BY INDIRECT RESTRAINTS so long as no law is passed that prohibits free speech, press, petition, or assembly as such. We have therefore REPEATEDLY HELD THAT LAWS WHICH ACTUALLY AFFECT THE EXERCISE OF THESE VITAL RIGHTS CANNOT BE SUSTAINED merely because they were enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the laws do in fact provide a helpful means of dealing with such an evil. [Emphasis added; other citations omitted.]

As has been demonstrated already, the statutory scheme at issue in this case affects and erodes--if not vitiates--prisoners' right to petition by imposing rather direct and severe restraints on their right of access to the courts. As a result, under the Supreme Court authority just cited, it "cannot be sustained." Id.

Petitioner acknowledges that "baseless litigation is not immunized by the First Amendment right to petition," as the Supreme Court held in Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 743 (1983). In that case, however, the Court was referring to "'litigation . . . based on INTENTIONAL FALSEHOODS or on KNOWINGLY FRIVOLOUS CLAIMS.'" Id., quoting Balmer, Sham Litigation and the

Antitrust Laws, 29 Buffalo L. Rev. 39, 60 (1980) (emphasis added).  Moreover, while it is true that "baseless litigation is not immunized by the First Amendment right to petition," id., it is equally true that:

> EXCEPT IN THE MOST EXTREME CIRCUMSTANCES CITIZENS CANNOT BE PUNISHED FOR EXERCISING THIS RIGHT "without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions." DeJonge v. Oregon, 299 U.S. 353, 364 . . . (1937) * * * . . . exercise of the right to petition "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," and the occasionally "erroneous statement is inevitable." New York Times Co. v. Sullivan, supra, 376 U.S., at 270-271, . . . . The First Amendment requires that we extend substantial "'breathing space'" to such expression, because A RULE IMPOSING LIABILITY WHENEVER A STATEMENT WAS ACCIDENTLY OR NEGLIGENTLY INCORRECT WOULD INTOLERABLY CHILL "would-be critics of official conduct . . . from voicing their criticism." 376 U.S., at 272, 279 . . . .

McDonald, 472 U.S. at 486-487 (emphasis added).

The IDOC and PRB have interpreted the statutory scheme at issue in this case as mandating punishment whenever a judge uses the word "frivolous" to describe a pleading, motion, or other paper filed by a prisoner.  They have NOT limited this punishment to prisoner litigation "based on INTENTIONAL FALSEHOODS or on KNOWINGLY FRIVOLOUS CLAIMS," which is the sort of "baseless litigation" the Supreme Court has held is "not immunized by the First Amendment right to petition." Bill Johnson's Restaurants, Inc., 461 U.S. at 743 (emphasis added).  Nor have they limited this punishment to "the MOST EXTREME CIRCUMSTANCES." McDonald, 472 U.S. at 486 (emphasis added).  Rather, since they interpret this statutory scheme as lacking a mens rea requirement, they impose punishment even when the prisoner's pleading, motion, or other paper contains a statement or argument which is ACCIDENTLY OR NEGLIGENTLY INCORRECT." Id., at 487 (emphasis added).

As a result, under the Supreme Court authority cited supra, this statutory scheme cannot be sustained because it intolerably chills prisoners from exercising their right of access to the courts.  In addition to being unconstitutionally vague, this statutory scheme is unconstitutionally overbroad because "in its reach it prohibits constitutionally protected conduct." Grayned, 408 U.S. at 114.  Moreover, given both the number and frequency of erroneous frivolity determinations by the courts (C-817), this statutory scheme is overbroad because it WILL result in the punishment of prisoners who did not, in fact, file a frivolous pleading, motion or other paper!

A comparison of Illinois' statutory scheme with its federal counterpart provides additional evidence that Illinois' statutory scheme is unconstitutionally vague and overbroad.  Illinois' statutory scheme was created by the legislature (via P.A. 89-656 § 15) shortly after the Prison Litigation Reform Act of 1996

(enacted by Congress; hereinafter PLRA) became effective on April 26, 1996.
Included in the PLRA was the creation of Title 28 U.S.C. § 1932, entitled
"Revocation of earned release credit."  It states, in pertinent part:

> In any civil action brought by an adult convicted of a crime and confined
> in a Federal correctional facility, **THE COURT** may order the revocation of
> such earned good time credit . . . if, on its own motion or the motion of
> any party, **THE COURT FINDS** that--
>     (1) **THE CLAIM** was filed for a malicious purpose;
>     (2) **THE CLAIM** was filed solely to harass the party against which it was
>         filed; or
>     (3) the claimant testifies falsely or otherwise **KNOWINGLY PRESENTS FALSE
>         EVIDENCE OR INFORMATION TO THE COURT.**  [Emphasis added.]

One glaring difference between Illinois' statutory scheme and 28 U.S.C. § 1932
is that the latter clearly contains a <u>mens</u> <u>rea</u> requirement.  All three circum-
stances under which a prisoner can lose his good time credits under the terms
of 28 U.S.C. § 1932 involve intent based actions!

The second material difference between Illinois' statutory scheme and 28
U.S.C. § 1932 is that the latter entrusts **BOTH** the finding of guilty **AND** the
imposition of punishment **SOLELY** to **THE COURT,** rather than to prison officials,
who are often the defendants in the claims filed by prisoners (and who, as a
result, have a motive to retaliate).  This virtually eliminates the probability
of arbitrary and discriminatory (and retaliatory) enforcement, which is a fatal
flaw of Illinois' statutory scheme.

A third material difference between Illinois' statutory scheme and 28 U.S.C.
§ 1932 is that the latter is written in language that is much more easily under-
stood by the ordinary prisoner.  Words such as "malicious" and "harass" are cer-
tainly familiar to most prisoners and to those unfamiliar with these words, they
are easily defined and explained by a lay person.  One does not need to do exten-
sive research in the prison law library to understand the meaning of these words,
in stark contrast to phrases such as those found in Section 3-6-3(d)(1)(A) and (C).

Finally, unlike Illinois' statutory scheme, 28 U.S.C. § 1932 limits its
reach to the sort of "baseless litigation" described in <u>Bill Johnson's Restau-
rants, Inc.</u>, 461 U.S. at 743, and does not mandate punishment when prisoners make
"accidently or negligently incorrect" statements in their pleadings, motions, or
other papers, as does Illinois' statutory scheme.  <u>McDonald</u>, 472 U.S. at 486.

In <u>City of Chicago v. Morales</u>, 527 U.S. 41, 52 (1999), the Court held that:

> imprecise laws can be attacked **ON THEIR FACE** under two different doctrines.
> First, the overbreadth doctrine permits the **FACIAL INVALIDATION** of the laws
> that inhibit the exercise of First Amendment rights if the impermissible
> applications of the law are substantial when "judged in relation to the
> statute's plainly legitimate sweep." <u>Broadrick v. Oklahoma</u>, 413 U.S. 601,
> 612-615 . . . (1973).  Second, even if an enactment does not reach a

> substantial amount of constitutionally protected conduct, it may be imper-
> missibly vague because it fails to establish standards for the police and
> public that are sufficient to guard against the arbitrary deprivation of
> liberty interests.  Kolender v. Lawson, 461 U.S. 352, 358 . . . (1983)
> [emphasis added].

The Court found that "the vagueness of this enactment makes a facial challenge appropriate" and based its decision on its finding that the ordinance in ques-tion "contains **NO MENS REA REQUIREMENT** . . . , and infringes on constitutionally protected rights . . . ." Id., at 55 (emphasis added).

In this case, as has been demonstrated supra, the statutory scheme at issue is written in language that the ordinary prisoner cannot possibly understand. (In fact, as noted on page 3, supra, even college educated, experienced penolo-gists and attorneys—and at least one circuit court judge thus far—cannot interpret it!)  It lacks a mens rea requirement, contains insufficiently clear standards for those who enforce it, and is written so broadly that it infringes on prisoners' constitutional right of access to the courts to the point that it inhibits the exercise of that right.  For these reasons, and for the additional reasons stated supra, Petitioner respectfully submits that 730 ILCS 5/3-6-3(d) and 730 ILCS 5/3-3-2(a)(8) **ARE FACIALLY UNCONSTITUTIONAL** and should be declared so by this Honorable Court!

**Ground two:**  THE STATUTORY SCHEME AT 730 ILCS 5/3-6-3(d) AND 730 ILCS 5/3-3-2(a)(8) WAS UNCONSTITUTIONALLY APPLIED TO PETITIONER, IN VIOLATION OF HIS RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

In Superintendent, Massachusetts Correctional Institution, Walpole v. Hill, 472 U.S. 445, 454 (1985), the Supreme Court held that:

> revocation of good time does not comport with "the minimum requirements of
> procedural due process," id., at 558, 94 S.Ct., at 2976, unless the find-
> ings of the prison disciplinary board are supported by **SOME EVIDENCE** in
> the record [emphasis added].

Accord Hamilton v. O'Leary, 976 F.2d 341, 344-345 (7th Cir. 1992).  In Illinois (as noted on pages 8 and 27 of the Petition), the authority to hear and decide cases brought by the IDOC against a prisoner in its custody, for court dismissal of a frivolous lawsuit, is vested exclusively in the PRB, according to the plain language set forth in Sections 3-6-3(d) and 3-3-2(a)(8).  Therefore, under Hill, the PRB cannot revoke a prisoner's Good Conduct Credits unless there is "some evidence in the record" to support the charges brought against the prisoner by the IDOC.

In Petitioner's case, the sole charge against him listed in the Revocation Recommendations filed with the PRB by the IDOC was that he "[f]iled a **LAWSUIT** that was ordered to be frivolous."  C-625 & 739 (emphasis added).  Since the

Revocation Recommendation is, in effect, the charging instrument (a fact never disputed by the State), and since that was the sole charge listed in **BOTH** Revocation Recommendations, the **ONLY** question before the PRB was whether or not Petitioner was guilty of **THAT** charge!  In other words, the **ONLY** determination the PRB was authorized to make was whether or not Petitioner **had** "[f]iled a **LAWSUIT** that was ordered to be frivolous"!  C-625 & 739 (emphasis added).

As noted on pages 18-20 and 24-25 of the Petition, the **EVIDENCE** presented by Petitioner **OVERWHELMINGLY** and **CONCLUSIVELY** establishes his **ACTUAL INNOCENCE** of the sole charge leveled against him in the Revocation Recommendations!  His civil rights complaint (the "lawsuit" referred to in the Revocation Recommendations) **SURVIVED BOTH** a motion to dismiss **AND** a motion for summary judgment! (This fact is established by Judge Baker's Orders dated February 15, 2002 and October 3, 2003.  C-583-595 & 799-810.)  Subsequently, as noted on page 25 of the Petition, Petitioner reached a settlement with the defendants in the aforementioned civil rights "lawsuit" (i.e., the <u>Snyder</u> defendants).  C-032-033. Clearly a "lawsuit" that survives **both** a motion to dismiss **and** a motion for summary judgment and is ultimately settled by the defendants is **NOT** "frivolous" as that term is defined either in the statute pursuant to which Petitioner's Good Conduct Credits were revoked or in the case law which has interpreted that statutory language.  As the Court held in <u>Lawrence v. Wilder Richman Securities Corp.</u>, 467 F.Supp.2d 228, 233 (D.Conn. 2006) "evidence of settlement of an action . . . **CAN** be considered" to determine whether or not a lawsuit is frivolous (emphasis added).

Given the fact that the **<u>EVIDENCE</u> OVERWHELMINGLY** and **CONCLUSIVELY** establishes Petitioner's **ACTUAL INNOCENCE** of the sole charge leveled against him in the IDOC's Revocation Recommendations, and given the Supreme Court's requirement that at least "some evidence" support the charges against him, it is clear that the PRB's revocation of Petitioner's Good Conduct Credits constitutes **both** a violation of his right to due process **and** an unconstitutional application of the statutory scheme to him!  <u>Hill</u>, 472 U.S. 445 at 454.

The IDOC also unconstitutionally applied the statutory scheme to Petitioner and violated his right to due process in that the findings of guilty by the Adjustment Committee (which were upheld by the ARB and Director Snyder) were **FLATLY CONTRADICTED** by the **evidence!**  As noted on page 15 of the Petition, the IDR's charged Petitioner with violating 730 ILCS 5/3-6-3(d) and based that charge **EXCLUSIVELY** upon the Orders issued by Judge Baker on October 9, 2001 and October 29, 2001.  C-469, 480, 482 & 484.  Similarly—and more important—the findings

of guilty by the Adjustment Committee were **ALSO** based **EXCLUSIVELY** on Judge Baker's October 9th and October 29th Orders.  C-525 & 528.  While the word "frivolous" does appear in both Orders, Judge Baker does not define the word in either Order and does not make reference to 730 ILCS 5/3-6-3(d) in either Order.  In the October 29th Order, Judge Baker does not even provide a rationale for his decision.

In order to trigger the Good Conduct Credit revocation procedures set forth in the statutory scheme at issue, "a **SPECIFIC FINDING**" of frivolity by "the court" is required.  730 ILCS 5/3-6-3(d) (emphasis added).  The statute also sets forth very specific definitions of the word "frivolous."  (See 703 ILCS 5/3-6-3(d)(1).) Given the very clear requirements of the statutory scheme, it is clear that the mere use of the word "frivolous" by a court is **NOT** sufficient.  As a result, Judge Baker's use of the word "frivolous" in his October 9th and October 29th Orders falls far short of the "specific finding" of frivolity necessary to trigger application of the Good Conduct Credit revocation procedures set forth at 730 ILCS 5/3-6-3(d).  Since the Adjustment Committee's findings of guilty are based **EXCLUSIVELY** upon Judge Baker's October 9th and October 29th Orders, and since neither Order qualifies as the "specific finding" of frivolity required by 730 ILCS 5/3-6-3(d), the **EVIDENCE** simply does **NOT** support the Adjustment Committee's decision.  As a result, the disciplinary action taken against Petitioner by the IDOC constitutes **BOTH** a violation of his right to due process **AND** an unconstitutional application of the statutory scheme to him!

In the proceedings below, the State made much ado of the fact that Judge Baker employed the use of the phrases "legally frivolous" and "lacks an arguable basis either in law or in fact" in his November 8, 2001 Order.  C-511.  They seem to suggest that this is somehow dispositive of the issue.  It is not, for a number of reasons.

First, if Judge Baker felt that Petitioner's motions warranted sanctions, **HE** could have imposed them pursuant to his authority under Rule 11 of the Federal Rules of Civil Procedure, which has essentially the same definition of "frivolous" as 730 ILCS 5/3-6-3(d).  That he did not--and in this case he did not even issue a verbal reprimand--suggests strongly that he did **NOT** regard Petitioner's motions as being sanctionable; therefore, they are not violative of 730 ILCS 5/3-6-3(d).

Second, and more important, in his November 4, 2001 letter to Judge Baker, Petitioner **SPECIFICALLY** asked His Honor if his use of the term "frivolous" was intended to mean the same thing as that term is defined at 730 ILCS 5/3-6-3(d)(1). C-505.  In his January 23, 2002 Order, Judge Baker answered Petitioner's question,

-10-

stating:  "the court has made **NO FINDING** its characterization of the plaintiff's motions as frivolous means the same as the term frivolous under 730 ILCS 5/3-6-3-(d)." C-575-576 (emphasis added).  Clearly the January 23rd Order **IS dispositive** of the issue; Judge Baker **EXPLICITLY** states that he did **NOT** make the "**SPECIFIC FINDING**" of frivolity **MANDATED BY**--and necessary for establishing a violation of--730 ILCS 5/3-6-3(d)!  (Emphasis added.)  The IDOC's decision to uphold the Adjustment Committee's findings of guilty against Petitioner even after receiving Judge Baker's January 23rd Order constitutes **both** a violation of his right to due process **and** an unconstitutional application of the statutory scheme to him, since the Order **FLATLY CONTRADICTS** the Adjustment Committee's findings!

### There WAS--and IS--an Arguable Basis Both in Law and in Fact for the Motions Judge Baker Denied as Frivolous

As a preliminary matter, Petitioner respectfully submits that since the definition of "frivolous" found at 730 ILCS 5/3-6-3(d)(1) is borrowed verbatim both from the United States Supreme Court's decision in <u>Neitzke v. Williams</u>, 490 U.S. 319, 325 (1989), and from Rule 11 of the Federal Rules of Civil Procedure (a fact noted on page 8 of the Petition and conceded by the State on pages 18-19 of their first Appellate Court Brief; C-793-794), the standard for finding a pleading or motion frivolous under Section 3-6-3(d) should be the same as the standard used by the courts when determining whether a pleading or motion is frivolous under either <u>Neitzke</u> or Rule 11.  Courts have held repeatedly that when the legislature enacts a statute which utilizes terms or phrases that have "a long history of judicial interpretation," there is a presumption that the legislature intended for that statute to be interpreted the same way.  <u>Williams v. Wilmington Trust Co.</u>, 345 F.3d 128, 133 (2nd Cir. 2003) (citing <u>INS v. St. Cyr</u>, 533 U.S. 289, 312 n. 35 (2001) (citing <u>Morissette v. United States</u>, 342 U.S. 246, 263 (1952))).  For this reason, in the discussion which follows, Petitioner will evaluate his allegedly frivolous motions by using the standards established by the case law interpreting and applying both <u>Neitzke</u> and Federal Rule 11.

It is important to take note of **precisely** what Judge Baker said in his initial Order, dated October 9, 2001.  C-469.  He stated, in pertinent part:

> The plaintiff essentially argues that the defendants should be sanctioned because this court's granting of in forma pauperis status to the plaintiff amounts to a favorable screening under 28 U.S.C. § 1915A.  **THIS ARGUMENT** is frivolous.  The court has not yet conducted a merit review of the plaintiff's complaint under 28 U.S.C. § 1915A.  * * *  The fact that the plaintiff has been granted leave to proceed in forma pauperis and the defendants have been served means nothing with regard to the merit of plaintiff's claims [emphasis added].

Again, Petitioner emphasizes the fact (as noted on pages 9, 15 and 30-31 of his

-11-

Petition) that Judge Baker characterized as "frivolous" only **ONE** out of **SEVERAL ARGUMENTS** advanced by Petitioner **both** in his motion for sanctions **and** in the Memorandum of Law he submitted in support thereof. C-392-435. Even assuming arguendo that one of the arguments Petitioner advanced in his motion and support-ing memorandum is frivolous, the question is whether that one frivolous argu-ment renders the entire motion and memorandum frivolous.

In Lerch v. Boyer, 929 F.Supp. 319, 324 (N.D.Ind. 1996), the Court answered this question, stating:

> Perhaps one of the best ways of defining the term "frivolous," as it appears in the 1993 version of Federal Rule 11, is to articulate what it is not. For example, the mere absence of legal precedent, the **PRESENTA-TION OF AN UNREASONABLE LEGAL ARGUMENT,** or the failure to prevail on the merits of a particular legal contention (or in the entire case being liti-gated) **CANNOT JUSTIFY A FINDING OF FRIVOLOUSNESS.** [Emphasis added.]

Other courts have held similarly. In Golden Eagle Distributing Corp. v. Bur-roughs Corp., 801 F.2d 1531, 1540 (9th Cir. 1986), the Court held that "Rule 11 does **NOT** apply to the mere making of a frivolous **ARGUMENT.**" (Emphasis added.) Accord Brown v. Federation of State Medical Boards of U.S., 830 F.2d 1429, 1434 n. 2 (7th Cir. 1987); Paine Webber, Inc. v. Can Am Financial Group, Ltd., 121 F.R.D. 324, 330 (N.D.Ill. 1988); and Leonardo's Inc. v. Greathall, Ltd., 714 F. Supp. 949, 955 n. 5 (N.D.Ill. 1989) (holding that "one frivolous **ARGUMENT** in an otherwise legitimate brief does **NOT** violate Rule 11." (Emphasis added.)).

Since Judge Baker characterized as frivolous only **ONE** out of **SEVERAL** argu-ments advanced by Petitioner in his motions and supporting memoranda, it is clear that under the authority cited in the preceding paragraph, Petitioner's motions did **NOT** violate **EITHER** Rule 11 **OR** 730 ILCS 5/3-6-3(d), given the fact that the definition of "frivolous" found at 730 ILCS 5/3-6-3(d)(1) is borrowed verbatim from Rule 11. As a result, the determinations made by both the IDOC and the PRB, and the actions they took as a result, are contrary to established law and constitute a violation of Petitioner's due process rights and an uncon-stitutional application of the statutory scheme to him.

It is clear from Judge Baker's October 9th Order (C-469) that what he found "frivolous" about Petitioner's argument was: (1) Petitioner's assumption that Judge Baker had already conducted the screening **mandated** by 28 U.S.C. § 1915A; and (2) Petitioner's conclusion that Judge Baker's decision to grant him leave to proceed in forma pauperis amounted to a finding that he had stated a claim upon which relief could be granted.

The problem with Judge Baker's finding of frivolity is that in reaching his conclusion, he clearly overlooked the authority Petitioner cited in support of

his argument. In paragraph 3 of his first motion for sanctions (C-393), Peti-
tioner quoted Chief U.S. District Court Judge Michael M. Mihm, who stated, on
page 3 of his July 9, 1996 Memorandum, that "federal Courts **MUST DENY** leave to
proceed _in forma pauperis_ if the complaint **FAILS TO STATE A CLAIM UPON WHICH
RELIEF MAY BE GRANTED**"! (Emphasis added.) C-476. This Memorandum alone pro-
vides a legal basis for the argument Judge Baker termed frivolous; and remember,
the IDOC **ADMITS** that **THIS MEMORANDUM** was posted in the prison Law Library!
(This fact was noted both in paragraphs 212-215 of Petitioner's Complaint filed
in the state court (C-064) and by the IDOC's Institutional Adjustment Committee
in its Final Summary Reports. C-525 & 528.)

In addition, Petitioner cited **FIVE** cases in the Memorandum he submitted in
support of his motion! C-397-398. Those cases hold that: (1) the screening
process mandated by 28 U.S.C. § 1915A **IS SUPPOSED TO BE CONDUCTED PRIOR TO
SERVICE** of the complaint upon the defendants (see, e.g., McGore v. Wrigglesworth,
114 F.3d 601, 604-605 (6th Cir. 1997)); and (2) a favorable screening **IS** tanta-
mount to a finding that the plaintiff **HAS STATED A CLAIM UPON WHICH RELIEF CAN
BE GRANTED**! (See, e.g., Jones v. Russell, 950 F.Supp. 855, 856 (N.D.Ill. 1996).)

Additional authority which demonstrates conclusively that the argument Peti-
tioner made in his first motion for sanctions was **NOT** frivolous includes In re
Funkhouser, 873 F.2d 1076, 1077 (8th Cir. 1989), in which the Court held that:

> Determination of the question of leave to proceed in forma pauperis under
> 28 U.S.C. § 1915 should **PRECEDE** both the issuance and **SERVICE** of process.
> A summons should **NOT** issue if, in fact, the case has been found to be
> frivolous. [Emphasis added.]

Similarly, in Roman v. Jeffes, 904 F.2d 192, 195-196 (3rd Cir. 1990), the Court
held that:

> In light of the Supreme Court's reasoning in Neitzke and the underlying
> **PURPOSES** of § 1915, we hold that **THE** appropriate **TIME** to make a decision
> **TO DISMISS** a case pursuant to § 1915(d) **IS BEFORE SERVICE OF A COMPLAINT**.
> Accord Williams v. White, 897 F.2d 942, 944 n. 1 (8th Cir. 1990) (Section
> 1915(d) should be used to screen out frivolous claims only at the outset
> of litigation, before service). * * * . . . **DISMISSING** the case as frivo-
> lous **AFTER SERVICE** on defendants **DOES NOT SERVE THE NEITZKE GOAL** of using
> § 1915(d) to weed out frivolous claims at the outset. [Emphasis added.]

(Note: § 1915(d) is now § 1915(e)(2), as a result of an amendment to the statute;
the language, however, is essentially the same.) Accord Webster v. Gibson, 913
F.2d 510, 514 (8th Cir. 1990) (also citing Neitzke); Welch v. Folsom, 925 F.2d
666, 669-670 (3rd Cir. 1991); Rourke v. Thompson, 11 F.3d 47, 49 (5th Cir. 1993);
Lujano v. Omaha Public Power Dist., 30 F.3d 1032, 1034 (8th Cir. 1994); Urrutia
v. Harrisburg County Police Dept., 91 F.3d 451, 455 n. 4 (3rd Cir. 1996); King
v. Federal Bureau of Prisons, 415 F.3d 634, 636 (7th Cir. 2005) (holding that

-13-

28 U.S.C. § 1915A(a) "requires district judges to screen prisoner suits for merit **AS SOON AS THEY ARE FILED . . . .**" [Emphasis added.]); and McCullough v. Ligon, 430 F.Supp.2d 846, 851 (E.D.Ark. 2006) (holding that: "Determining whether a complaint meets the requirements of 28 U.S.C. § 1915 **PRECEDES** the decision whether to grant IFP status. See Carney v. Houston, 33 F.3d 893, 895 (8th Cir. 1994)." [Emphasis added.]).

In Harris v. Ford, 32 F.Supp.2d 1109, 1110 (D.Alaska 1999), after noting that the defendants appeared to be taking the position that the Court was order-ing service prior to conducting the screening mandated by 28 U.S.C. § 1915A, the Court held that "**THIS POSITION BORDERS ON THE FRIVOLOUS**"! (Emphasis added.) In other words, the position that the Court held "borders on the frivolous" was the defendants' position that the Court was conducting itself **EXACTLY AS JUDGE BAKER ADMITTED HE WAS CONDUCTING HIMSELF** in Petitioner's case! Therefore, under Harris, it is Judge Baker's position that is "frivolous," not Petitioner's!

The Supreme Court weighed in on this issue in Crawford-El v. Britton, 523 U.S. 574, 596 (1998), holding that "the statute [28 U.S.C. § 1915A] . . . directs district courts to screen prisoners' complaints **BEFORE DOCKETING . . . .**" (Empha-sis added.) Given the Supreme Court's interpretation of the requirements of 28 U.S.C. § 1915A, it is clear that Judge Baker's interpretation and practice were incorrect. More important, the Supreme Court's interpretation clearly shows that Petitioner's argument––including the assumption upon which it was based––was **NOT** frivolous, because there was a legal basis for it!

When deciding whether a litigant has violated Rule 11 by asserting a legally frivolous claim, courts are reluctant to find such a violation in cases where there is little or no authoritative precedent precluding the claim. In Anderson v. Smithfield Foods, Inc., 353 F.3d 912, 916 (11th Cir. 2003), for example, the Court of Appeals overturned the district court's imposition of sanctions pursuant to Rule 11 "[i]n light of the paucity of controlling precedent." Similarly, in Chaplin v. Du Pont Advance Fiber Systems, 303 F.Supp.2d 766, 770 (E.D.Va. 2004), the Court refused to find a violation of Rule 11 because "although the Court has found no authoritative case law anywhere in the nation to support Plaintiff's claim . . . , neither has it found a single, binding case to the contrary." Accord In re Cross Media Marketing Corporation Securities, 314 F.Supp.2d 256, 269 (S.D.N.Y. 2004) (citing Pierce v. Tripler & Co., 955 F.2d 820, 830–831 (2nd Cir. 1992).

In this case, neither Judge Baker nor the Snyder defendants ever cited **ANY** authority that contradicted Petitioner's argument! Similarly, throughout the

protracted litigation in the State courts, the State has **NEVER** cited **ONE** case that contradicted the argument they claim is frivolous!  As a result, under the abundant authority cited supra, it is clear that Petitioner's argument did **NOT** violate **EITHER** Rule 11 **OR** 730 ILCS 5/3-6-3(d), since, as previously noted on page 11 of this Memorandum of Law, the same standard applies to both!

Courts are reluctant to find a violation of Rule 11 when the litigant is proceeding pro se.  "While it is true that Rule 11 applies both to represented and pro se litigants, the court may consider the special circumstances of litigants who are untutored in the law."  Maduakolam v. Columbia University, 866 F. 2d 53, 56 (2nd Cir. 1989).  "[T]he more lenient standards of competence and compliance apply" to pro se litigants.  Simpson v. Putnam County Nat. Bank of Carmel, 112 F.Supp.2d 284, 291 (S.D.N.Y. 2000) (citing Maduakolam).  A litigant's pro se status IS one of the "factors to be considered when determining whether sanctions are warranted and, if so, the type and degree of any sanction that should be imposed."  Id. (citing the Advisory Committee Notes accompanying the 1993 Amendments to Rule 11).  Accord Mills v. Brown, 372 F.Supp.2d 683 (D.R.I. 2005).  As the Court held in Johnson v. Lyddane, 368 F.Supp.2d 529, 532 (E.D.Va. 2005):

> Pro se pleadings, however, are "granted a degree of indulgence not extended to lawyers when determining in whether to impose monetary sanctions pursuant to Rule 11."  Laremont-Lopez v. Southeastern Tidewater Opportunity Center, 968 F.Supp. 1075, 1078 (E.D.Va. 1997).

Accord Hale v. Lefkow, 239 F.Supp.2d 842, 845-846 N. 1 (C.D.Ill. 2003) (holding that:  "Since Hale is pro se, the Court will not initiate sanctions.  See Fed. R. Civ. P. 11(c)(1)(B).  If this complaint had been filed by an attorney, the Court would not be so inclined.").  Similarly, in Thomas v. Capital Sec. Services, Inc., 836 F.2d 866, 875 (5th Cir. 1988), the Court held that:  "As to the determination of whether a reasonable inquiry into the law has been made, a district court may consider . . . the pro se status of a litigant . . . ."  Accord Brown, 830 F.2d at 1435; Burkhart Through Meeks v. Kinsley Bank, 804 F.2d 588, 590 (10th Cir. 1986); and Thomas v. Evans, 880 F.2d 1235, 1240 (11th Cir. 1989).

Furthermore, courts adhere "to the principle that pro se parties shall be sanctioned under Rule 11 **ONLY after SUCCESSIVE** attempts to press a **WHOLLY** frivolous **CLAIM**."  Reinert v. O'Brien, 805 F.Supp. 576, 579 (N.D.Ill. 1992) (citing, inter alia, Ricketts v. Midwest National Bank, 874 F.2d 1177, 1182 n. 4 (7th Cir. 1989) (emphasis added)).  As the Court held in Boggs v. Die Fliedermaus, LLP, 286 F.Supp.2d 291, 302 (S.D.N.Y. 2003):

> Sanctions are inappropriate in this case as Cerrone is a pro se litigant, there is **NO EVIDENCE HE FILED** his motion **IN BAD FAITH**, he has **NOT FILED**

-15-

**REPEATED** motions lacking in merit, and he has received **NO PRIOR WARNINGS** from the Court. Because Cerrone is a pro se litigant, **THE IMPOSITION OF SANCTIONS FOR CONDUCT ABOUT WHICH HE HAD NOT BEEN EXPLICITLY WARNED IS IMPROPER.** [Emphasis added.]

Again, when one applies this standard to Petitioner, it is clear that sanctions were **ENTIRELY IMPROPER!** Petitioner's pro se status, the lack of **ANY PRIOR WARNING**, the lack of a history of filing frivolous motions, pleadings or lawsuits (and, in fact, Petitioner's litigation history demonstrated quite to the contrary, since **ALL** of the lawsuits he had filed against the IDOC up to that point in time survived **both** motions to dismiss **and** motions for summary judgment), and Judge Baker's **EXPLICIT** finding that Petitioner did **NOT** file his motions in bad faith, are all factors which militate **AGAINST EITHER** a finding of frivolity **OR** the imposition of sanctions under 730 ILCS 5/3-6-3(d)!

### The **Evidence** Conclusively Establishes Petitioner's Actual Innocence

As noted on pages 12-15 of the Petition, the Snyder defendants and their attorney, Assistant Attorney General (AAG) Michael J. McGee, made **SEVERAL MATERIAL** factual and legal **MISREPRESENTATIONS** to Judge Baker in pleadings filed with the Court in that case. Specifically, those pleadings include their Motion to Dismiss (C-365-366), the Memorandum in Support of their Motion to Dismiss (C-370-388), and their Response to Petitioner's first Motion for Sanctions (C-437-445). Petitioner addressed these misrepresentations in his two motions for sanctions (C-392-395 & 448-449) as well as in the Memoranda of Law submitted in support of those two motions. C-397-435 & 451-465.

As noted on pages 15 and 19 of the Petition, Judge Baker **NEVER ADDRESSED** Petitioner's allegation that the defendants in the Snyder case made numerous misrepresentations in the aforementioned pleadings! Judge Baker's dismissals of Petitioner's motions as frivolous were based **SOLELY** upon **ONE** argument advanced by Petitioner in his **first** motion for sanctions! As Petitioner has already demonstrated on pages 12-14 supra, Judge Baker's finding of frivolity as to that argument was not only indisputably incorrect, but also contrary to established legal authority, including authority from the United States Supreme Court! This leaves the issue of the Snyder defendants' numerous misrepresentations.

### The Snyder Defendants DID Make NUMEROUS Misrepresentations to Judge Baker

On pages 13-14, 19-20 and 23-25 of the Petition, Petitioner has already provided several examples of the misrepresentations made by the Snyder defendants in their pleadings filed in that case; therefore, Petitioner will not repeat what has already been stated, but will emphasize just a few of the misrepresentations

-16-

in this Memorandum of Law.

As noted on page 13 of the Petition, AAG McGee attempted to support the Snyder defendants' claim that Petitioner's complaint in the Snyder case was barred by the statute of limitations **BY MISSTATING THE DATE ON WHICH IT WAS ACTUALLY FILED!** Specifically, AAG McGee stated that: "Plaintiff's very first filing in this matter, his petition to proceed in forma pauperis, was filed on February **21**, 2001." (Emphasis added.) C-379.

In fact, as noted in the Memorandum in support of Petitioner's first motion for sanctions, Petitioner's complaint and his petition to proceed in forma pauperis were filed simultaneously on February **12**, 2001! C-399-401. This is evidenced by the file-stamp on the copies of the complaint and the I.F.P. petition returned to Petitioner by the district court clerk. C-265 & 351.

The State will undoubtedly claim that this was just an inadvertent mistake-- a typographical error. The fact is, however, that Petitioner sent AAG McGee an advance copy of his first motion for sanctions **THREE WEEKS PRIOR TO FILING IT!** (This fact is noted both in Petitioner's Complaint filed in the State court in this case (see paragraph 6; C-004-005), and on the Notice of Filing/Certificate of Service attached to said motion. C-435.) This provided AAG McGee the opportunity to correct this error or at least admit that it was a mistake. He never did. His failure to do either suggests strongly that this was a **DELIBERATE MISREPRESENTATION!** In any event, this evidence clearly provides an arguable basis for Petitioner's claim that AAG McGee misstated the filing date.

As also noted on page 13 of the Petition, Petitioner also alleged (in his memorandum of law supporting his first motion for sanctions) that AAG McGee **MISSTATED** the United States Supreme Court's holding in Shaw v. Murphy, 532 U.S. 223 (2001) by claiming that it held that inmates have **NO** constitutionally protected right to assist each other with their legal problems. Specifically, on page 15 of his Memorandum in Support of Defendants' Motion to Dismiss, AAG McGee stated: "It is clear from the Shaw case that Plaintiff in the case at bar has **NO FIRST AMENDMENT RIGHT TO ASSIST OTHER INMATES WITH THEIR LEGAL WORK.**" (Emphasis added.) C-384.

On pages 16-17 of his Memorandum in support of his first motion for sanctions, Petitioner demonstrated conclusively that AAG McGee misstated the Supreme Court's holding in Shaw by quoting from the Shaw opinion. C-412-413. Specifically, Petitioner noted that "[i]n the very first paragraph of his opinion, Justice Thomas stated:

In this case, we are asked to decide whether prisoners possess a First

-17-

Amendment right to provide legal assistance that **enhances the protections otherwise available** under Turner.  We hold that they do not.  149 L.Ed.2d at 424 [emphasis added].

Thomas further qualified--and limited--the Court's position by stating:

> In this case, we are **NOT** [emphasis added] asked to decide whether pris-oners have any First Amendment rights when they send legal correspondence to one another.  [emphasis in original] * * *  Instead, the question pre-sented here simply asks whether Murphy possesses a First Amendment right to provide legal advice that **enhances the protections otherwise available** under Turner.  The effect of such a right, . . . would be that inmate-to-inmate correspondence that includes legal assistance would receive **MORE** First Amendment protection than correspondence without any legal assis-tance.  We conclude that there is no such **special** right [emphasis added; 149 L.Ed.2d at 426] * * * . . . the issue before us is whether Turner per-mits an **INCREASE** in constitutional protection whenever a prisoner's com-munication includes legal advice.  We conclude that it does not [emphasis added; 149 L.Ed.2d at 427]."

As a result, the Shaw opinion itself provided the arguable basis for Petitioner's claim that AAG McGee had misstated the Supreme Court's holding in Shaw!

Subsequently, in Auleta v. LaFrance, 233 F.Supp.2d 396, 399-400 (N.D.N.Y. 2002), the Court addressed **THE VERY SAME ARGUMENT** by the defendants in that case! The Court stated:

> Defendant maintains that the Supreme Court's recent decision in Shaw held that an inmate's provision of legal assistance to another inmate is **NOT** protected under the First Amendment and therefore cannot provide the basis of a retaliation claim.  **HOWEVER** [emphasis added], in Shaw, the Supreme Court held that an inmate does not have a special [emphasis in original] constitutional right to provide unauthorized legal assistance to another inmate.  The Supreme Court **did NOT HOLD that inmate-provided legal assistance is NOT CONSTITUTIONALLY PROTECTED**.  Instead, it held that such conduct must be evaluated under the standard set forth in Turner, rather than under a heightened standard that accords greater protection to legal (as opposed to non-legal) communication.  See Shaw, 532 U.S. at 228, 121 S.Ct. 1475 [emphasis added].

The Court then quoted from **THE VERY SAME SECTION** of the Shaw opinion that Peti-tioner had quoted on pages 16-17 of his Memorandum in support of his first motion for sanctions (and has quoted above)!  C-412-413.  Clearly this additional authority demonstrates conclusively that Petitioner had an arguable basis for his claim that AAG McGee had misstated the Court's holding in Shaw.

When one considers **ALL** of the facts surrounding this issue together with the abundant authority supporting Petitioner's position, it is clear that he **IS ACTUALLY INNOCENT** of the charges that he violated 730 ILCS 5/3-6-3(d)!  There was--and is--an arguable basis for **ALL** of the arguments advanced by Petitioner in his motions for sanctions and supporting memoranda of law in the Snyder case. Clearly, the statutory scheme at issue **WAS UNCONSTITUTIONALLY APPLIED** to Peti-tioner!  For these reasons, Petitioner respectfully requests that this Honorable

-18-

Court find in his favor on this issue, vacate his conviction on these charges, and order the restoration of his Good Conduct Credits.

**Ground three:**  PETITIONER'S GOOD CONDUCT CREDITS WERE REVOKED IN A MANNER WHICH VIOLATED HIS RIGHT TO DUE PROCESS, AS GUARANTEED TO HIM BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

As noted on pages 26-29 of the Petition, both the IDOC and the PRB flagrantly violated Petitioner's procedural and substantive due process rights by ignoring the numerous state statutes and provisions of the Illinois Administrative Code that govern the disciplinary hearing process in general and the Good Conduct Credit revocation process specifically.  The administrative hearing before the IDOC's Institutional Adjustment Committee was chaired by Lt. Daniels, a woman who clearly was **NOT** impartial, but who suffered from a very obvious conflict of interests.  Her denial of Petitioner's request to call Judge Baker as a witness and seek answers to the questions posed by Petitioner, which were relevant to the very issue before the Adjustment Committee, clearly violated Petitioner's fundamental, constitutionally protected rights.  Similarly, her failure to continue the hearing until after Judge Baker ruled on Petitioner's Motion to Alter or Amend Judgment, constituted a denial of due process, given the nature of that pending motion and the probability that Judge Baker's decision would provide evidence relevant either to Petitioner's guilt or innocence of the charges before the Adjustment Committee or to the punishment to be imposed in the event of a guilty verdict.  In addition, Lt. Daniels ignored exculpatory evidence, did not even examine the pleadings at issue (or the evidence Petitioner submitted in support of his position), and failed to support her decision with the minimum explanation mandated by the Departmental Rules and state statutes governing such procedures.

Similarly, the IDOC Director and his Administrative Review Board ignored the exculpatory evidence presented by Petitioner, which included **THREE** Orders issued by Judge Baker **SUBSEQUENT** to the Adjustment Committee hearing.  Those Orders **CONCLUSIVELY** established Petitioner's **ACTUAL INNOCENCE** of the charges leveled against him!

The Prisoner Review Board also violated Petitioner's fundamental due process rights by finding Petitioner guilty and revoking his Good Conduct Credits **WITHOUT PROVIDING HIM THE HEARING MANDATED** both by their own rules, as set forth in the Illinois Administrative Code, and by the statutory scheme which governs the Good Conduct Credit revocation process!

In Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902 (1976), the

Supreme Court held that:

> The "right to be heard **BEFORE** being condemned to suffer grievous loss of any kind, **even though it may NOT involve the stigma and hardships of a criminal conviction**, is a principle basic to our society." Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 168 . . . (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard "AT A MEANINGFUL TIME AND IN A MEANINGFUL MANNER." Armstrong v. Manzo, 380 U.S. 545, 552 . . . (1965). See Grannis v. Ordean, 234 U.S. 385, 394 . . . (1914). [Emphasis added.]

Similarly, in Zinermon v. Burch, 494 U.S. 113, 127 (1990), the Court, citing Mathews with approval, held that:

> the Court usually has held that the Constitution requires some kind of a hearing before the State deprives a person of liberty or property. See, e.g., Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542 . . . (1985) ("'[T]he root requirement' of the Due Process Clause" is "'that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest'" (emphasis in original)) [other citations omitted, emphasis in original].

Accord Morrell v. Mock, 270 F.3d 1090, 1095 (7th Cir. 2001). These basic principles of due process apply to prison inmates as well. Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

Applying the above-cited authority to the facts set forth in Ground three of the Petition (and summarized above) leads one to the ineluctable conclusion that Petitioner was denied his fundamental due process right to be heard at a meaningful time and in a meaningful manner **BEFORE** the PRB revoked six months of his Good Conduct Credits. For that reason alone, this Honorable Court should issue the writ, reverse the PRB's decision, and order restoration of Petitioner's Good Conduct Credits.

In addition to denying Petitioner the hearing mandated by the statutory scheme at issue, the PRB's own rules, and the due process clause of the federal constitution, the PRB denied Petitioner due process by approving the revocation of six months of his Good Conduct Credits in the **absence** of **ANY evidence** supporting the **ONLY** charge listed in the Revocation Recommendations, i.e., that Petitioner "[f]iled a **LAWSUIT** that was ordered to be frivolous." (Emphasis added.) C-625 & 739. As noted both on pages 22-25 of the Petition and on pages 8-9 of this Memorandum of Law, the **EVIDENCE** not only fails to support this charge, but **OVERWHELMINGLY** and **CONCLUSIVELY** establishes Petitioner's **ACTUAL INNOCENCE** of this charge! Given these facts, and given the "some evidence" standard governing the revocation of good time established by the United States Supreme Court in Hill, 472 U.S. at 454, it is clear that the action taken against Petitioner by the PRB did **NOT** "comport with 'the minimum requirements of procedural due process.'" Hill, 472 U.S. 445, 454 (quoting Wolff, 418 U.S., at 558). For

-20-

this additional reason, this Honorable Court should issue the writ, overturn the PRB's decision, and order that Petitioner's Good Conduct Credits be restored.

**Ground four:** THE ILLINOIS APPELLATE COURT'S APPLICATION OF 730 ILCS 5/3-6-3(d) AND 730 ILCS 5/3-3-2(a)(8) TO THE FACTS PRESENT IN PETITIONER'S CASE IS IN DIRECT CONFLICT WITH ITS APPLICATION OF THE AFOREMENTIONED STATUTES TO THE SUBSTANTIALLY SIMILAR FACTS PRESENT IN PEOPLE V. KELLY, NO. 2-04-0574 (RULE 23 ORDER DATED JULY 16, 2007), AND, AS A RESULT, VIOLATES PETITIONER'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION.

In Del Vecchio v. Illinois Dept. of Corrections, 31 F.3d 1363, 1386 (7th. Cir. 1994), the Court held that "an equal protection violation occurs . . . when different legal standards are arbitrarily applied to similarly situated defendants. Dobbert v. Florida, 432 U.S. 282, 301 . . . (1977)." See also Griffith v. Kentucky, 479 U.S. 314, 323 (1987). As noted on pages 30-32 of the Petition, the Illinois Appellate Court's application of the statutory scheme at issue to the defendant in People v. Kelly, No. 2-04-0574 (Rule 23 Order dated July 16, 2007) is completely at odds with its application of said statutory scheme to Petitioner in the instant cause. Applying Del Vecchio and the authority cited therein to the facts of Petitioner's case leads one to the ineluctable conclusion that the Illinois courts violated Petitioner's constitutional rights to due process and equal protection. For that reason alone, this Honorable Court should issue the writ, vacate Petitioner's conviction and order his Good Conduct Credits restored.

Respectfully submitted,

Paul N. Eichwedel, pro se

### DECLARATION UNDER PENALTY OF PERJURY

Pursuant to 28 U.S.C. § 1746 and 18 U.S.C. § 1621, I hereby declare under penalty of perjury that everything stated in the foregoing Petition for Writ of Habeas Corpus and the Memorandum of Law in support thereof is true and correct to the best of my knowledge, information and belief.

Paul N. Eichwedel, Petitioner
Reg. No. B-02148
Dixon Correctional Center
P.O. Box 1200
Dixon, Illinois  61021-1200

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

United States of America ex rel.        )
                                        )
PAUL N. EICHWEDEL, Reg. No. B-02148,    )
                                        )
PETITIONER                              )
                                        )
      vs.                               )        CASE NO:_____
                                        )
NEDRA CHANDLER, Warden, Dixon           )
                    Correctional Center, )
RESPONDENT.                             )
                                        )

### NOTICE OF FILING

To:  Office of the Clerk of the          Janon E. Fabiano
     U.S. District Court                 Assistant Attorney General
     United States Court House           100 W. Randolph St., 12th Floor
     211 South Court Street              Chicago, Illinois   60601
     Rockford, Illinois   61101
                                         1 copy
     1 original & 2 copies

      PLEASE TAKE NOTE that on the 21st day of April, 2008, I filed through the
U.S. Mail, with the above-named parties, at the above-listed addresses, in the
above-stated amounts, my **PETITION FOR WRIT OF HABEAS CORPUS.**

### CERTIFICATE OF SERVICE

      Pursuant to 28 U.S.C. § 1746 and 18 U.S.C. § 1621, I hereby declare under
penalty of perjury that I served the above-listed document upon the above-named
parties at the above-listed addresses in the above-stated amounts by depositing
it into correctly addressed envelopes and tendering said envelopes to a correc-
tional officer at the Dixon Correctional Center (together with an Authorization
for Payment of Postage voucher attached thereto, authorizing the institution's
Business Office and Mailroom to charge my Inmate Trust Fund Account for the cost
of mailing said envelopes First Class U.S. Mail **and** authorizing them to issue a
check made payable to the Clerk of the U.S. District Court in the amount of $5.00,
to cover the filing fee) on April 21, 2008.

                              *Paul N. Eichwedel*

                              Paul N. Eichwedel, Petitioner
                              Reg. No.  B-02148
                              Dixon Correctional Center
                              P.O.  Box  1200
                              Dixon, Illinois   61021-1200

This Correspondence Is From
An Inmate Of The Illinois
Dept Of Corrections

$ 04.60⁰

UNITED STATES POSTAL
MAILED FROM ZIPCODE 61021

_____ _____
P.O. Box 1200
Dixon, IL 61021-1200

Office of the Clerk of the
U.S. District Court
United States Court House
211 South Court Street
Rockford, IL 61101

LEGAL MAIL